No. 32,266

Hurst Majors, *Appellee*, v. Fay N. Seaton, *Appellant*.

(46 P. 2d 34)

Opinion filed July 6, 1935.

*George Clammer, Hal E. Harlan* and *A. M. Johnston,* all of Manhattan, for the appellant.

*Ira C. Synder,* of Manhattan, *C. Vincent Jones* and *W. T. Roche,* both of Clay Center, for the appellee.

The opinion of the court was delivered by

Thiele, J.: This is an appeal from a judgment awarding damages for the publication of an alleged libel.

In 1925 plaintiff was a candidate for the office of mayor of the city of Manhattan and was defeated. He was a candidate in 1928 and was elected and served until April, 1931, when his term expired.

He was not a candidate to succeed himself. He became a candidate in the spring of 1932 for the office of commissioner of streets and public utilities.

Defendant had been for some years previous, and was in 1932, engaged as the publisher of *"The Morning Chronicle"* in the city of Manhattan, in which paper various articles with reference to the election were published. On March 5, 1932, the following article, written by the defendant, was published. For convenience in reference hereafter we have numbered the paragraphs of the article.

"WHAT A DECEIVER!

1. "What a deceiver Hurst Majors has turned out to be in his relations to the Manhattan public!

2. "Telling us he could not get the public service commission at Topeka to do anything about a hearing on the telephone rate matter, and, at the same time, leading the public service commission at Topeka to believe he did not wish the case he brought as mayor pushed, and also neglecting to file with the commission the briefs he had promised to file, so the case could be decided!

3. "Making us believe that he was fighting for our interests against the electric company, even when he was drawing the mayor's salary from the city and was, at the same time, on the pay roll of the electric company's cold-storage plant!

4. "Working under cover to get a franchise for the electric company in Manhattan, at the same time he was supposed by the public to be earning his salary as mayor by fighting the utility companies and looking after our interests!

5. "Refusing with his mouth at a mass meeting what he denounced as a bribe, and accepting it with his hands! Think of the gall he showed by accepting his two pay checks—one from the city and one from the cold-storage company—and, with brazen callousness under the circumstances, cashing them at local banks!

6. "What must such supporters of Hurst Majors as believed him sincere in his profession of friendship for the people of Manhattan think of him now!

7. "What must Colonel George Frank, who fought for him up and down the streets of Manhattan then, think of him now!

8. "What must Dr. C. O. LaShelle, that sterling democrat who Manhattan hopes will receive the democratic nomination for congress in this district, and who lined up Aggieville for him then, think of him now!

9. "Ask them!

10. "None of them support him today, as do not also hundreds of his former partisans.

11. "And what must Judge C. A. Kimball, that old war horse who sincerely favors municipal ownership of public utilities, who believed in Hurst's sincerity, and who has been the brains behind the Hurst Majors front all these years—what must he think of the Mayor who sold out his constituents, his friends, and his political principles, if any, now that the truth about Hurst Majors is coming to light, and the hollowness of his professions!

12. "The time has come when Manhattan should state in no uncertain terms what it thinks of such a man as Hurst has showed himself to be, by voting Tuesday an emphatic No to his desire to get back on the public pay roll.

13. "Let him work honestly for his living.—F. N. S."

Feeling himself aggrieved, plaintiff instituted suit, alleging that the publication provoked him to wrath, exposed him to public hatred, contempt and ridicule, charged him with bribery and misconduct in office; that it was unfair and untrue and maliciously published to his actual damage in the sum of $20,000 and because of malice he should have $10,000 as punitive damages, for which he prayed.

Defendant's answer admitted the publication, set up his publishing the newspaper, the candidacy of plaintiff, that he became advised of certain facts, investigated them, and then wrote and published the article. There is denial that the language used was intended to charge plaintiff with the crime of bribery and an allegation that it does not so charge, and specific reference is made to a speech by plaintiff wherein plaintiff said: "When I take an offer, I am going to take it in marked bills and a lot of them." Defendant alleged that the language of the article complained of was designed to state that plaintiff had accepted with his hands that which with his mouth he had denounced as a bribe. He further answered that he believed each statement in the article to be true; that the publication was without malice and made solely in discharge of his duty as a newspaper publisher to advise the voting public of the facts set forth.

The trial was by a jury which rendered a verdict for $1,000 actual and $750 punitive damages, and answered special questions as follows:

"1. Do you find that the article complained of by the plaintiff was published in a campaign in which the plaintiff was seeking the office of commissioner of public utilities in the city of Manhattan? A. Yes.

"2. Do you find from the evidence, by a preponderance thereof, that when the defendant published the article in question he believed the statements therein contained to be true? A. No.

"3. If your answer to question No. 2 is in the affirmative, then state whether such belief was based upon a reasonable investigation of the truth of the statements made therein under the circumstances. (Not answered.)

"4. Does the evidence disclose the fact to be that the defendant published the article in question for the purpose of advising the public of what the defendant, in good faith, believed showed the unfitness of plaintiff for the office

which he was then seeking, and to enable the voting public to vote more intelligently? A. No.

"5. Were the facts as discovered by the defendant and in his possession at the time of the publication in question of such a character as to justify a belief in the truthfulness of the statement as published? A. No.

"6. Do you find from the evidence that the plaintiff, while running for the office of public utilities commissioner in 1932, gave public expression to statements by language calculated to deceive the public as to his former relations to the cold-storage company? A. No.

"7. Did Hurst Majors sell out his constituents, his friends, and his political principles? A. No."

The above verdict was rendered on April 25, 1934. The defendant moved the court to set aside the answers to all questions except No. 1 upon the ground the answers were contrary to and not supported by the evidence and for the further reason the jury in answering them was actuated by passion and prejudice. The defendant also moved for a new trial on statutory grounds. On September 5, 1934, the court overruled both motions and on November 8, 1934, notice of appeal was filed. Consideration is therefore limited to the correctness of the court's rulings on the motions following the trial.

Were the answers to the special questions supported by or contrary to the evidence?

In an action of this kind necessarily the evidence covered a wide field, showing matters of inducement and explanation, including other articles published by defendant and published replies of the plaintiff, which need not here be repeated. By reference to the article, it will be observed that only paragraphs 2 to 5, inclusive, can be said under any circumstances to charge plaintiff with misconduct in office or with the crime of bribery. In the course of the trial, the evidence was not taken with specific reference to the paragraphs of the alleged libelous article, and some of the matters inquired of and the answers thereto referred to one or more of the various paragraphs. Therefore what is here said with reference to particular paragraphs, in some instances applies to other paragraphs.

With reference to paragraph 2, plaintiff testified that it was a half-truth; that he had filed a petition for lower rates, the commission (public service commission) doubted it had power to declare rates secured in 1925 unlawful and had asked for briefs; that Hughes, as city attorney, had promised to prepare a brief, but so far as witness knew none had been prepared.

"Judge Greenleaf said if I was not satisfied with respect to jurisdiction to go ahead and file the briefs, but I did not do it. I came home and told the people in this circular that the public service commission seemed disinclined to grant us any relief."

With reference to paragraph 3, plaintiff, while mayor, was personally engaged in the cold-storage business. Either the United Power & Light Corporation or a subsidiary owned a plant in Manhattan. A contract was entered into between the Power & Light Securities Company and plaintiff and others as a syndicate, providing for the organization of a new company to purchase the stock of the cold-storage company. In another contract between the securities company and one Emerson, one of the syndicate, it was provided the plant should be bought. We are not concerned with these contracts further than plaintiff's own statement that Emerson's right to buy $20,000 par value of the stock for $10,000 cash was for the joint and equal benefit of himself and Emerson; that after the company was formed he received a salary from April 15, 1931 (he was mayor until April 21, 1931), to October, 1931. He also testified that—

"I knew at all my dealings that the Power & Light Securities Company, the United Power & Light Company and the cold-storage company were all hooked up together, and that the United had a connection with the cold-storage company."

And plaintiff further testified:

"The statement in the article complained of that I was drawing the mayor's salary and at the same time on the pay roll of the electric company's cold-storage plant, was true. . . . I repeatedly made the public believe that I was fighting for their interests on these franchises. . . . The statement 'making us believe that I was fighting for our interests against the electric company' was true all the time I was mayor, and it is true that I was also on the pay roll of the electric company's cold-storage plant while I was mayor."

With reference to paragraph 4, plaintiff testified in regard to the dealings as to the cold-storage plant that subsequently the company wished to discontinue Emerson's connection; that Majors dealt between Emerson and the company and the company paid Emerson at least $10,000, of which Majors got half, and, as abstracted:

"As to the proposition made to me by Bill Emerson, the United did spend, not $100,000, but $200,000 and gave me a lease on part of the premises that I value at $50,000. I did tell the public at that meeting that I had refused this proposition which I regarded as a bribe and I did later go in with the United people in a cold-storage deal and served on the board of directors with them,

and I did accept with my hands this creamery lease and ice contract, and a salary from the cold-storage company, a part of which was paid while I was still mayor, and I cashed checks, both from the city and from the cold-storage company, at local banks. The $5,000 check payable to Hurst Majors was cashed at the Fidelity National Bank, Kansas City, Mo. This money was personally mine and I carried my personal account at the Union National Bank, but I sent this check to the company account as stated. On February 7, 1931, I published in the *Mercury* a statement in which I said, 'We have obtained several reductions in light and power rates, through friendly negotiations, and have had our stand justified by the pledge of the public service commission that they will shortly order a still lower rate into effect here in Manhattan. We are unquestionably near bottom in the matter of light and power rates.

"'In any event we are $75,000 to $100,000 closer to bottom than we were three years ago and only the matter of the contract and franchise to do business here remains to be settled.' Beside this article is a picture of me published by the *Mercury*."

With reference to paragraph 5, plaintiff testified that over a year before he went into the cold-storage plant, he made a speech in the community house in which he described the attempt to bribe him. He testified also as to meeting representatives of the United Power & Light Company to discuss building a cold-storage plant, the contracts, etc., as above mentioned, the efforts to displace Emerson, and, as abstracted:

"When I talked to Emerson to get his terms to submit to Clayton Kline over the phone and Emerson demanded $10,000, I was to share in it. 'He said if I would get it, he would give me half of it' and I got half of it from the cold-storage people. Emerson told me he would give me half of anything he got from them for getting him out, excepting that he wanted six months' salary. I was to get half of the ice contract; half of the creamery and half of the $10,000. In the settlement there with Clayton Kline on May 15, [1931] I got $5,000."

The above is only a portion of the testimony, and there is none that contradicts it; it is the plaintiff's own version. We need not go further into it to detail the steps taken whereby plaintiff procured a loan for $30,000 on his own properties, the money being furnished either by the power and light company or its subsidiaries or associated companies. Neither need we review other testimony of plaintiff as to his efforts to get lower rates in Manhattan, for, whatever view might be taken of that testimony, the above shows plainly that insofar as the general charges against him in the article complained of are concerned, he admitted their substantive truthfulness. Although the burden may have been on the defendant to show

truthfulness, plaintiff's own version of the whole sordid business showed that the statements in the article were not wide of the mark. The motion to set aside the answers on the ground they were contrary to and not supported by the evidence should have been sustained.

Attention has been directed to the plaintiff's political career, and in addition to what has been said it is clear from the record that he had rather a consistent course in that he stood forth as an opponent of public utilities, and a proponent of lower rates paid to them for services. It may be assumed that his continuance in office was distasteful to one or more of the companies operating in Manhattan. Regardless of who initiated the dealings or the motives that prompted them, when the new cold-storage company idea was inaugurated, plaintiff and representatives of the electric light and power company worked out an arrangement whereby the company was to aid plaintiff, and when the syndicate was formed and arrangements made for the $20,000 of stock, of which plaintiff was to get half, Majors was asked whether he was going to run for mayor again and he said he was not, and at that time he was definitely told that if the power and light company put money into the plant and built it and he was taken into the operation of it he would have to confine himself to the business of the company and not fool with political enterprises. Upon Majors' acceptance of conditions, matters went ahead, the new company was organized and Majors qualified as a director on April 11, 1931, and commenced drawing salary April 15, 1931. While he makes quite a point of having only one share, it is undisputed he had it and gained other advantages heretofore detailed from his connection with the business. Matters of this kind are not kept secret very long, and when a year later he became a candidate for commissioner of streets and public utilities, and again campaigned, at least in part, on the ground that he was a foe of utilities and a friend of the people, opposition arose.

It is not necessary that we here enter into a discourse on the law of libel, the liberty of the press, or the duty of the publisher of a newspaper, for in a situation in many respects like that here, this court, in an opinion by Mr. Justice Burch, considered the whole subject in *Coleman v. MacLennan*, 78 Kan. 711, 98 Pac. 281.

We shall content ourselves by saying that in the situation here presented, it was the right, if not the duty, of the defendant to call

to the attention of the citizens of Manhattan the facts which he honestly believed to be true, together with such comment thereon as was reasonably connected therewith, for the purpose of enabling the electors to vote more intelligently at the coming election, and if all was done in good faith, the publication was privileged even though some of the statements might be untrue and derogatory to the character of the candidate. There is no showing of lack of good faith except through an involved process of reasoning; that is, that the statements of the article charge plaintiff with bribery and misfeasance in office, are presumed to be false and are therefore malicious. That theory will not avail here (*Coleman v. Mac-Lennan,* supra), and even if it would, it still would not help, for, as has been demonstrated, plaintiff's admissions are that the statements of fact in the publication are substantially correct, or at least so nearly so that the attempt to show wherein they are not is a mere quibble. The publication was conditionally privileged, there was no showing of malice, and under the admitted facts plaintiff could not recover.

Complaint is also made that the verdict was given under the influence of passion and prejudice, occasioned in large part by an inflammatory argument by plaintiff's counsel. We shall not here set forth the studious efforts of plaintiff and his counsel to keep before the jury the connection of the utilities company with various phases of Manhattan political affairs and the matters complained of during the trial. Even though they were not objected to, such expressions as "Who is furnishing the ammunition in this lawsuit? Who is furnishing the evidence? Is it Seaton? No. The United Power," and "There isn't anything to this lawsuit, only an attempt—and the United Power Company is carrying it on today—to crucify Hurst Majors," and others of similar import, had no place in the argument. In one instance an objection was made to a statement the United Power was too smart to call certain witnesses, and the court reproved the speaker and instructed the jury to disregard all argument of that type. The question recurs as to what the effect of the court's rebuke and instruction is after the improper remark has been made. In this case it seems evident that the jury was inflamed by the argument; otherwise it would not have returned the verdict it did as against the plaintiff's own admissions.

As the matter comes here, perhaps from a technical standpoint

it should be said that the trial court erred in not granting a new trial for the reason that the verdict was contrary to the evidence and was the result of passion and prejudice and therefore a new trial should be had, but in view of the fact that under plaintiff's own admissions he cannot recover, no good purpose would be served in granting a new trial. Under R. S. 60-3317, this court is directed to render such judgment as it deems that justice requires. For the reasons given, it is apparent no good purpose would be served by another trial, and therefore the judgment of the lower court is reversed and the cause remanded with instructions to render judgment for the defendant.