No. 50,769

RONALD R. HEIN, *Plaintiff-Appellant,* v. STERLING E. LACY, *Defendant-Appellee.*

(616 P.2d 277)

Opinion filed July 18, 1980.

*Ronald R. Hein,* pro se, argued the cause and was on the brief for the plaintiff-appellant.

*Charles R. Hay,* of Goodell, Stratton, Edmonds, Palmer and Wright, of Topeka, and *Thomas O. Rost,* of Rost and Rost, of Topeka, argued the cause, and *Thomas E. Wright,* of Goodell, Stratton, Edmonds, Palmer and Wright, was with them on the brief for the defendant-appellee.

The opinion of the court was delivered by

PRAGER, J.: This is an action to recover damages for an alleged libel, arising from the publication and distribution of a brochure in the closing days of the 1978 primary election campaign. The plaintiff, Ronald R. Hein, was and is the Kansas state senator from the 20th Senatorial District, Shawnee County, Kansas. At the time of the publication, he was a candidate for the Republican nomination for the Second Congressional District. The defendant, Sterling E. Lacy, is a professional family counselor who served as state chairman of the American Party. The brochure was prepared for mailing at the defendant's office which, at the time, was also the state headquarters of the American Party.

On July 25, 1978, just six days before the August 1st primary election, the defendant Lacy caused to be distributed by mail and by hand around 22,000 copies of a brochure concerning the plaintiff Hein. A verbatim copy of the brochure is as follows:

# TWO MAJOR MORAL ISSUES FACING AMERICA'S YOUTH TODAY

## HOMOSEXUALITY

The sin of Sodom and Gomorrah came close to being legalized in the State of Kansas

Most people remember the Bible story of the destruction of Sodom and Gomorrah, but few remember that the sin of those two wicked cities was homosexuality.

Let's review the story: Abraham pleaded with God to save the city of Sodom if as few as ten righteous men could be found. God sent two messengers, angels who were dressed as men, to destroy the city. The two men spent the night in Sodom with Abraham's nephew, Lot. When the inhabitants of the city heard that Lot had the two visitors in his home, they surrounded the house and demanded: "Where are the men who came to visit you tonight? Bring them out to us that we may rape them." (Genesis 19.5, Moffatt)

In the process of caring about the homosexual and helping him out of his perverted lifestyle, we must not accept that lifestyle as a legal, operational part of our schools, churches, business and government programs. We must legally reject this immoral behavior or lose God's blessing on our nation and incur the wrath of God. Let's send the message to those state senators who voted to legalize homosexuality.

## MARIJUANA

A Case History by a Marijuana User:

"I started smoking hashish and marijuana on a very casual basis (you go to a friend's house and a joint is passed around), but after a short while use became more frequent and weekend experiences extended well into the week.

"The dreamlike state of drugs is too powerful, too convincing, too subtle to permit insight. Before long the drugs themselves mollify and eventually suppress all conflicts about their use.

"Another joint, and all anxiety miraculously vanished.

"An individual can carry on virtually any task even while drugged, at least initially, effects can be so misleading. These don't reveal the inner anguish, the subconscious gropings, the elaborate network of delusion, the insidious deterioration in intellectual functioning, or the collapse of self-discipline.

"I even managed to get myself another degree; of course I had to have a few joints to cope with the slightest pressure, the slightest demands. The cost was enormous. After five years of using 'soft' drugs (with supposedly no dependence), its evils finally emerged: Divorce, chronic unemployment, two psychotic breakdowns and the suicide of a friend as I stood by helpless because of my own turmoil.

"Recovery hasn't been easy. I have had to cope with tenacious visual and auditory hallucinations, frequent and long memory lapses, frightening flashbacks, the inability to focus my attention and a lingering world of dreams and fantasies so convoluted as almost to defy description And far worse for me was the painful realization that five years in the prime of my life were utterly lost.

"A large part of the problem with 'soft' drugs is that they have received, and still receive, so much sanction from respectable and well-meaning people.'"

*Marijuana Reappraised: Two Personal Accounts by Martin Croos & Andre McNicoll (The Myrin Institute for Adult Education, 521 Park Ave. New York, NY 11021)

"The hottest places in hell are reserved for those who, in a period of moral crisis maintain their neutrality."

Dante

I am only one person, but I shall no longer refuse "to get involved." I have had enough. What about you? How much longer will you stand aside?

Dr. Sterling E Lacy
Marriage and Family Counselor
629 Quincy—Suite 204
Topeka, Kansas 66603

Pot

"Gays" &

the coming

election...

A Second look

at the personable

RON HEIN

Please read this letter before you vote this Tuesday—Aug. 1st

AN OPEN LETTER FROM: A FAMILY THERAPIST

TO: SECOND CONGRESSIONAL DISTRICT REPUBLICANS

RE: SEN. RON HEIN'S LEGISLATIVE STAND ON DECRIMINALIZATION OF MARIJUANA AND LEGALIZATION OF HOMOSEXUALITY

## DEAR REPUBLICAN VOTER,

I counsel teenagers. I counsel teenagers and their families. I am on the firing line regularly with families being torn apart by marijuana or homosexuality. The battleground is the minds of our youth. The ammunition is ideas expressed in words. Whoever is the most persuasive wins the war.

My task of trying to salvage any future happiness for these young people is made extremely more difficult by personable political leaders like Ron Hein who try to make homosexuality more acceptable by voting to legalize it and marijuana more acceptable by personal efforts to decriminalize it.

## RON HEIN AND THE DECRIMINALIZATION OF MARIJUANA

The records of the Federal and State Affairs Committee hearings on March 17 & 31, 1977, clearly show that both Ron Hein's arguments and his votes were in favor of the decriminalization of marijuana. Can't Senator Hein and those who are lax about marijuana see that their arguments have the effect of encouraging marijuana use?

In order to promote the decriminalization of marijuana they argue that marijuana isn't harmful, doesn't slow thinking or reactions, in no way causes a dependency by the user, doesn't lead to so-called "hard" drugs, etc. And yet, my personal observations of those who use marijuana regularly shows the opposite—how about you?

## I WAS SHOCKED TO FIND THAT SENATOR HEIN HAD VOTED TO LEGALIZE HOMOSEXUALITY

When a friend told me that the Kansas Senate had passed a bill (S.B. 310) this last legislative session that removed homosexuality as an "unlawful sexual act" (except in cases of aggravated sodomy), I just couldn't believe it! A bill to legalize homosexuality would pave the way for it to be presented in our schools as an "acceptable," "legal" alternate life style. Sixteen-year-olds could not be protected by law from the advances of a homosexual unless it was done by force or for hire.

I couldn't believe this was happening in Kansas. It sounded more like San Francisco. I told my friend I didn't believe it. However, I called a state senator who voted against S.B. 310 and he confirmed what my friend had said. He sent me to Legislative Research and they confirmed that S.B. 310 (which died in a House committee) was indeed designed to legalize homosexuality and that a majority of our State Senators had voted for it—including state senator Ron Hein! While homosexuals certainly need our concern and help, I can't for the life of me, understand the vote of Ron Hein and 21 of his colleagues.

## "CLEAN" POLITICS VS. "DIRTY" POLITICS

I met a politician recently who believes that "clean" politics is when candidates run on their own personalities and "dirty" politics" is when someone dares to drag issues into a campaign.

Has it become wrong to tell the truth? I ask, in the words of the apostle Paul, "Am I become your enemy because I tell you the truth?" No! Here in America, we still want the truth, no matter how bitter it is at times.

## PLEASE DON'T SEND RON HEIN'S VIEWS TO WASHINGTON

We are being asked to send Ron Hein an his views to Washington as being representative of us and ·our views. In my opinion, Ron Hein's views do not represent the views of most Republicans. If you agree with me, then please don't help send him on to Washington by voting for him next Tuesday.

Sen. Hein still has two years to serve in the Kansas Senate. Let's let him complete his term as state senator and watch his voting record more closely in the future. While Ron Hein would undoubtedly make a good next-door neighbor, the U.S. House of Representatives is a too critically important segment of our national government to entrust to someone with his present views.

## THEY JUST DIDN'T KNOW

I'm confident that Ron Hein's supporters were unaware of his position on the legalization of homosexuality and the decriminalization of marijuana when they contributed to his campaign...or when they put that bumper sticker on their car...or when they okayed that sign to be placed in their yard. Please, don't assume that Ron Hein's supporters were for the legalization of homosexuality or for the decriminalization of marijuana. They just didn't know!

Now that you do know, how about quickly cutting off the support...quietly peeling off the bumper sticker ...and calmly taking down your yard sign? And, in the secrecy of the voting booth next Tuesday, refuse to lend your support to the legalization of homosexuality and the decriminalization of marijuana by refraining from voting for Ron Hein.

Sincerely,

Dr. Sterling E. Lacy

Sterling E. Lacy, Ph.D.

P.S. Write me today if you would like to see a committee formed to stop the legalization of homosexuality and decriminalization of marijuana.

DON'T FORGET YOUR RESPONSIBILITY TO HIM

On July 31, 1978, the day before the primary election, plaintiff filed his petition in Shawnee County District Court, alleging that the brochure, by innuendo and misstatement of fact, was published with the malicious intent to defame and to reflect adversely upon plaintiff's candidacy. Plaintiff claimed, in substance, that the implication that he favored "pot and gays" was false and misleading, and, therefore, defamatory. He sought to recover both actual and punitive damages.

The defendant filed an answer in which he denied that the statements contained in the brochure were defamatory, alleging that the statements contained therein were true and, if not true in the fullest sense, were at least not actionable because he lacked any knowledge of their falsity. The parties then proceeded with discovery, obtaining admissions of fact and identifying and placing in the record certain documents, bills, and journals of the 1977 Kansas Senate and summaries of statements made before certain senate committees. These documentations are not disputed. They reflect the events surrounding the Senate committee's consideration of Senate Bill 310 (SB), pertaining to criminal prohibitions against certain sexual acts, and House Bill 2313 (HB), which would have reduced the penalty for possession of one ounce or less of marijuana. The voting record and positions taken by Senator Hein with respect to the two bills are clearly shown. In order to determine the issues raised on this appeal, we must first consider the background of each bill separately.

HB 2313 contained proposed amendments to the Uniform Controlled Substances Act (K.S.A. 65-4101 *et seq.*). At the time HB 2313 was being considered by the 1977 Kansas legislature, the possession of any quantity of marijuana was a class A misdemeanor, punishable by imprisonment in the county jail for up to one year or by a fine of up to $2,500 or both such fine and imprisonment (K.S.A. 1976 Supp. 65-4127b, 21-4502, and 21-4503). HB 2313, if enacted by the legislature, would have reduced the penalty for the possession of one ounce or less of marijuana to an unclassified misdemeanor punishable by a fine of not more than $100 for the *first* offense. Upon subsequent convictions, a person convicted of that offense would be punished as though guilty of a class A misdemeanor. The possession of greater amounts of marijuana than one ounce was subject to more severe penalties. The minutes of the Senate Federal and State Affairs Committee, dated March 31, 1977, reflect that Senator Hein

seconded the motion of Senator Allegrucci to recommend HB 2313 favorably for passage. This motion failed and the bill was ultimately reported to the Senate without recommendation. The journal of the Senate for April 4, 1977, (pp. 560-561) reflects that Senator Hein moved that HB 2313 be referred back to the Senate committee after Senator Angell moved that the bill be stricken from the calendar. On that same day, a roll call was taken on whether to reconsider the action of the Senate on HB 2313. Senator Hein voted for reconsideration of the bill, but the motion failed and the bill was not adopted. These documents make it clear from the actions and votes of Senator Hein that he favored the adoption of HB 2313. The question then arises whether HB 2313 provided for the "decriminalization of marijuana" which was the charge against Senator Hein contained in the statements of the defendant in the brochure. HB 2313 clearly would have provided for a substantial reduction in the penalty for the first-time conviction of a possession of a small quantity of marijuana. The ultimate issue is whether this result would constitute the "decriminalization of marijuana" as that term is generally understood in common usage today.

Included in the records of the Senate committee are the statements of various witnesses who appeared both in support of and in opposition to HB 2313. It is important to note that a number of the witnesses specifically referred to the reduction of the penalty on possession of small amounts of marijuana as the "decriminalization of marijuana." It is clear that the common understanding of many of these persons was that "decriminalization" did not mean the same as outright legalization—that decriminalization was a kind of halfway step toward legalization of marijuana. The witnesses appearing both in favor of and against the bill used the terms "decriminalization" and "legalization" in a manner reflecting a common understanding of those terms. The district court, in its memorandum decision granting summary judgment, concluded that the statements made by the defendant in the brochure that Senator Ron Hein's "arguments and his votes were in favor of the decriminalization of marijuana" fell within the ambit of fair comment and were protected under freedom of speech guaranteed by the First Amendment to the Constitution of the United States. Hence, it held such statements could not serve as a basis for an action in libel.

SB 310 would have amended several sections of the Kansas

Criminal Code pertaining to sex offenses. The bill would have re-defined and broadened the crime of sodomy for hire and would have defined bestiality as coitus with an animal and made it a crime. In addition, SB 310 would have repealed sections of the code prohibiting sodomy between consenting adults, adultery, and unlawful cohabitation. Although the purpose of the bill was apparently to outlaw massage parlors, the proposed legislation would have removed the prohibition against copulation between consenting adults of the same sex. In its memorandum decision granting summary judgment to the defendant, the court held that defendant's statements concerning SB 310 were not so recklessly false as to demonstrate the malicious intent to injure required by the Constitution before an action in defamation can be maintained by a public figure whose voting record is attacked. The trial court concluded that the defendant's comments were constitutionally protected and summary judgment was appropriate. The trial court granted summary judgment in favor of defendant Lacy, and the plaintiff Hein appealed to this court.

There are three basic issues raised on the appeal: (1) Whether the statements made by the defendant were substantially true; (2) if the statements were false, whether the record establishes lack of malice as a matter of law; and (3) whether summary judgment was granted to the defendant prematurely because discovery had not been completed.

At the outset, we should review certain general rules to be followed in determining a motion for summary judgment. Summary judgment should not be entered if there remain genuine issues of material fact. *Welch v. Young,* 225 Kan. 189, 589 P.2d 567 (1979). In considering a motion for summary judgment, a trial court must give to a litigant against whom judgment is sought the benefit of all inferences that may be drawn from the admitted facts under consideration. A court should be cautious in granting a motion for summary judgment when resolution of the dispositive issue necessitates a determination of the state of mind of one or both of the parties. *Gleichenhaus v. Carlyle,* 226 Kan. 167, 597 P.2d 611 (1979); *Bowen v. Westerhaus,* 224 Kan. 42, 578 P.2d 1102 (1978). It has been recognized that summary judgment should be employed with caution in defamation cases. However, summary judgment may properly be granted in a defamation case when the evidence shows no liability as a matter of law and where the essential facts are not in dispute. *Steere v. Cupp,* 226

Kan. 566, 602 P.2d 1267 (1979); *Gleichenhaus v. Carlyle,* 226 Kan. at 169.

Before specifically addressing plaintiff's claims, it would also be helpful to review some general principles of the law of defamation pertaining to public officials and candidates for public office as developed in decisions of this court and in decisions of the United States Supreme Court. The principal Kansas case setting forth the standards to be applied in a defamation action by a political candidate against one who has published criticism of the candidate is *Coleman v. MacLennan,* 78 Kan. 711, 98 Pac. 281 (1908). In *Coleman,* this court recognized the competing constitutional interests in freedom of the press and the individual's right to a remedy for injury to reputation. The court stressed the importance of open and unfettered debate about political issues, including the character and qualifications of political candidates. In the opinion the court stated:

"Under a form of government like our own there must be freedom to canvass in good faith the worth of character and qualifications of candidates for office, whether elective or appointive, and by becoming a candidate, or allowing himself to be the candidate of others, a man tenders as an issue to be tried out publicly before the people or the appointing power his honesty, integrity, and fitness for the office to be filled.

. . . .

"Paraphrasing this language, it is of the utmost consequence that the people should discuss the character and qualifications of candidates for their suffrages. The importance to the state and to society of such discussions is so vast, and the advantages derived are so great, that they more than counterbalance the inconvenience of private persons whose conduct may be involved, and occasional injury to the reputations of individuals must yield to the public welfare, although at times such injury may be great. The public benefit from publicity is so great, and the chance of injury to private character so small, that such discussion must be privileged." pp. 723-724.

Having found the published discussion of the candidate's qualifications to be conditionally privileged, the *Coleman* court went on to hold that a showing of malice—actual evilmindedness—was necessary to defeat the privilege and to make the false publication actionable. The burden of proving malice was placed on the plaintiff, and no presumptions were allowed. Proof of malice was to be established by interpretation of the writing which would indicate malignity or recklessness in making the charge. To permit good faith in the publication to be asserted as a defense to the libel struck a fair balance between the public need and the private right.

In *Good v. Higgins,* 99 Kan. 315, 161 Pac. 673 (1916), the court relied upon *Coleman* but elaborated:

"Before such statements concerning a candidate for office can be justified or excused as privileged, it must be shown that they were uttered in good faith, in the sincere belief of their truth, and with good reason to believe they were true, and that they were uttered in an honest endeavor to lay the facts before the electors as to the real fitness of the candidate who sought their suffrages." Syl. ¶ 4.

Accord, *Majors v. Seaton,* 142 Kan. 274, 280-281, 46 P.2d 34 (1935).

The public policy and resulting conditional privilege which protects comments on the character and fitness of political candidates also extends to comments and criticisms about incumbents and their conduct in office. *Kennedy v. Mid-Continent Telecasting, Inc.,* 193 Kan. 544, 549, 394 P.2d 400 (1964); *Stice v. Beacon Newspaper Corporation,* 185 Kan. 61, 340 P.2d 396 (1959); *Steenson v. Wallace,* 144 Kan. 730, 62 P.2d 907 (1936).

In *Schulze v. Coykendall,* 218 Kan. 653, 661, 545 P.2d 392 (1976), it was stated:

"Proof of actual malice in defamation actions when a conditional privilege is found to exist requires a plaintiff to prove that the publication was made with knowledge that the defamatory statement was false or with reckless disregard of whether it was false or not. (Citations omitted)."

See also *Bradford v. Mahan,* 219 Kan. 450, 454-455, 548 P.2d 1223 (1976).

*New York Times Co. v. Sullivan,* 376 U.S. 254, 11 L.Ed.2d 686, 84 S.Ct. 710 (1964), is the leading case of the United States Supreme Court pertaining to defamation actions by public officials. It was based in part on this court's decision in *Coleman.* In *New York Times Co.,* the court stressed the importance of free and unfettered political discussion. The court noted that erroneous statements are inevitable in a free debate, and must be protected to allow some "breathing space" during the debate. The court declared that public officials should be "men of fortitude, able to thrive in a hardy climate." 376 U.S. at 272-73. Because of the legitimate public interest in information concerning official conduct of public officials, criticism of official conduct should not lose its constitutional protection merely because it is effective and therefore diminishes official reputations. The court in *New York Times Co.* then held that for a public official to recover damages

for a defamatory falsehood relating to his official conduct, the first amendment requires that he prove with convincing clarity that the statement was made with actual malice, that is, with knowledge that it was false or with reckless disregard of whether it was false or not.

Following *New York Times Co.,* the Restatement (Second) of Torts § 580A defined the term Defamation of Public Official or Public Figure as follows:

"One who publishes a false and defamatory communication concerning a public official or public figure in regard to his conduct, fitness or role in that capacity is subject to liability, if, but only if, he

"(*a*) knows that the statement is false and that it defames the other person, or

"(*b*) acts in reckless disregard of these matters."

For there to be liability for defamation, there must be a publication of matter that is both defamatory and false. One who publishes a defamatory statement is not subject to liability if the statement is true. See Restatement (Second) of Torts § 581A; *Steere v. Cupp,* 226 Kan. 566; *Mundy v. Wight,* 26 Kan. 173 (1881); *Castle v. Houston,* 19 Kan. 417 (1877). In *Steere,* we held that where the published statements are substantially true, there is no malice and, hence, no liability. In comment (*f*) to § 581A of Restatement (Second) of Torts, it is stated:

"It is not necessary to establish the literal truth of the precise statement made. Slight inaccuracies of expression are immaterial provided that the defamatory charge is true in substance."

In determining the issue of libel in defamation cases brought by public officials, it is clear that each case must be decided on its own factual circumstances. On the basis of the entire record before us, we have concluded that the trial court properly granted summary judgment in favor of the defendant in this case. The statements made by defendant in the brochure essentially involve the voting record and views of the plaintiff in his capacity as a Kansas state senator. At the beginning, the brochure declares that it is an open letter "Re: Sen. Ron Hein's *Legislative Stand* on Decriminalization of Marijuana and Legalization of Homosexuality." (Emphasis added.) The words "vote," "voting," or "voted" are used eight different times in the brochure. Other references are made to Sen. Hein's "views" and his "position" on the legalization of homosexuality and the decriminalization of marijuana. Taken as a whole, we do not interpret the brochure as

an attack on the personal integrity or character of the plaintiff, it attacks only his views and voting record in areas where there is wide public controversy and difference of opinion.

We note from the records of the Senate committee that knowledgeable and respectable persons appeared on both sides of the issues presented by HB 2313. Professors, psychiatrists, and ministers spoke both in favor of and against HB 2313. We note, for example, that in 1972 the National Institute on Drug Abuse (the Schaefer Committee) issued its report to the President and to Congress recommending that the possession of a small amount of marijuana for personal use should not be a crime. Among the organizations listed as endorsing the reduction of criminal penalties for simple possession of marijuana are included the American Bar Association, American Public Health Association, the governing board of the American Medical Association, the National Education Association, the National Association for Mental Health, and the National Council of Churches. A number of respected law enforcement officers of the State of Kansas appeared before the Senate committee and testified in opposition to HB 2313. Clearly the subject matter of HB 2313 was one on which there is wide public disagreement, not only in Kansas but throughout the United States. As to SB 310, it was primarily directed toward the control of massage parlors but would have repealed the statute making consensual copulation between persons of the same sex a crime. We note that the bill passed the Senate and was, therefore, supported by a majority of its members. Suffice it to say, the issue as to the rights of homosexuals is one that has been in the press on numerous occasions in recent years and is also the subject of widespread controversy in various communities in this country.

On the undisputed factual background, we have concluded that the statements made by defendant in the brochure were substantially true. On the issue of decriminalization of marijuana, the district court interpreted the word "decriminalization" as that court felt it was commonly understood. It is apparent that the term "decriminalization of marijuana" is susceptible of various definitions. For support of plaintiff's definition of decriminalization, we note Black's Law Dictionary 371 (5th ed. 1979), where the term decriminalization is defined as "An official act generally accomplished by legislation, in which an act or omission, for-

merly criminal, is made non-criminal and without punitive sanctions." See also Harper Dictionary of Contemporary Usage 192 (1975), where it is stated that "decriminalize," of relatively recent coinage, is frequently used by persons seeking to abolish legal penalties for marijuana use, homosexual behavior, prostitution, or attempted suicide. The word "decriminalization" may not be found in Webster's Third New International Dictionary (1967). We note, however, that on page 579, the term "de" when used as a prefix with a verb may mean either to remove (a specified thing or things) or to *reduce or make lower.* Webster would permit the term "decriminalize marijuana" to be used in the sense of reducing or lowering the criminal penalty for possession of marijuana as well as to remove all criminal penalties. As noted by the district court, the plaintiff supported and voted for HB 2313 which would have reduced the legal penalty for the possession of small amounts of marijuana on first offenses. We have concluded that, under the interpretation of the term "decriminalization of marijuana" as that term was frequently used throughout the hearings before the Senate committee, the statements in the brochure that the plaintiff voted for and was in favor of the decriminalization of marijuana were substantially true and, therefore, a cause of action in defamation cannot be based upon the defendant's statements contained in the brochure referring to Sen. Hein's "views" and "position" on that subject.

We next consider the statement of defendant in the brochure that Sen. Hein voted to "legalize homosexuality." The plaintiff contends that the term "homosexuality" generally refers to a lifestyle rather than to homosexual intercourse, so that defendant's statement that plaintiff had voted to legalize homosexuality was false. It is undisputed that SB 310 would have removed any legal prohibition of consensual homosexual relationships. It is undisputed that the plaintiff voted for SB 310 along with the majority of the members of the state senate. Turning to Webster's Third New International Dictionary 1085 (1967), we find that the term "homosexuality" has more than one meaning. It is defined as "atypical sexuality characterized by manifestation of sexual desire toward a member of one's own sex." It is also defined as "erotic activity with a member of one's own sex." Taking the second definition, it is literally true that the plaintiff, in voting for SB 310, voted to legalize homosexuality. Hence, defendant's

statement is not actionable in defamation because the statement was substantially true. In passing, it should be noted that SB 310 would have expanded the definition of prostitution to include sodomy for hire, thus making homosexual relations for a price a crime.

In support of his position, the plaintiff maintains that the trial court erred in not finding the headlines contained in the brochure to be separate from the text òf the letter, and libelous even if the text was not. Under Kansas law, where a headline gives a "fair index of what follows in the article, and even though it might be said to exaggerate the character or conduct of the matter described in the article, such fact would not itself show express malice and prevent defendant from interposing the defense of conditional privilege." *Beyl v. Capper Publications, Inc.,* 180 Kan. 525, 528, 305 P.2d 817 (1957). It has also been held that headings and introductory portions of an article must be construed together with the article itself, and that mere exaggeration does not defeat the privilege of comment on official conduct. *Steenson v. Wallace,* 144 Kan. at 734. Applying Kansas law to the facts before the court, it cannot be said that the headlines and introductory material did not accurately reflèct the content of the following text, or that they were such an exaggeration as to demonstrate express malice in the publication.

The plaintiff contends that, if the literal meaning of the letter was not libelous, the imputation that he favored "pot" and "gays" was false and actionable in libel. The clear import of the letter was the plaintiff had voted for legislation which would have legalized homosexual intercourse and which would have reduced the criminal penalties for marijuana offenses. Any statement or inference that plaintiff's voting record indicated a preference for, or favor of, "pot and gays" would fall within the ambit of reasonable comment on official conduct. *Majors v. Seaton,* 142 Kan. 274. Additionally, an inference from the publication that plaintiff favored "pot and gays" might as easily have been inferred from a statement setting out the content and description of the two bills, rather than merely labeling their effect.

On the basis of the undisputed factual circumstances contained in the record, we hold that the statements made in the defendant's letter were substantially true. However, it should be added that the *whole* truth was not stated. It seldom is in political cam-

paigns. In this regard, we note the observations of the Supreme Court of Pennsylvania in *Clark v. Allen,* 415 Pa. 484, 488, 204 A.2d 42 (1964), where it is stated:

"It is deplorable but true that during a political campaign, candidates and their supporters often indulge in gross exaggeration, invectives, distorted statements, charges of being unfit for the office sought, gross incompetence, disregard of the public interest or the welfare of our Country, prophecies of war or doom if the opponent is elected, mudslinging, half truths and outright lies which are so defamatory that they not only deeply wound the feelings of the person attacked, but undoubtedly damage his political aspirations and often (for a time) his reputation. Nevertheless, the Supreme Court has apparently taken the position that the free expression of thoughts and opinions, charges, accusations, criminations and recriminations regarding men in public life and political matters are so valuable and so essential to the preservation or improvement of our Government that they must be permitted and constitutionally protected unless they are made with actual malice."

To preserve our freedoms, the expression of individual opinion and criticism of public officials must be given a broad scope. A person who holds political office should expect that opposition to his candidacy for reelection will be expressed at times with distortion and vituperation. A person who holds political office should not be a rabbit or wear his feelings on his sleeve. In this case it is easy to understand why the plaintiff was concerned by the language used and the time and manner in which the brochure was distributed. However, it is only under unusual circumstances that a public official may successfully seek redress in an action for defamation for injury to his reputation. This case does not present factual circumstances where such a cause of action is maintainable.

The judgment of the district court is affirmed.