Donald B. RINSLEY, M.D.,
Plaintiff-Appellant,

v.

Anthony BRANDT and William Morrow and Company, Inc., a corporation,
Defendants-Appellees.

No. 80–1623.

United States Court of Appeals,
Tenth Circuit.

Feb. 22, 1983.

Leon B. Graves, Topeka, Kan., for plaintiff-appellant.

Sam L. Colville, Kansas City, Mo. (Richard L. Sandler of Shook, Hardy & Bacon, Kansas City, Mo., and Grant M. Glenn of Cosgrove, Webb & Oman, Topeka, Kan., with him on the brief), for defendant-appellee Anthony Brandt.

Donald Patterson of Fisher, Patterson, Sayler & Smith, Topeka, Kan., for defendant-appellee William Morrow and Co., Inc.

Before SETH, Chief Judge, and BREITENSTEIN and LOGAN, Circuit Judges.

LOGAN, Circuit Judge.

Donald B. Rinsley, M.D., appeals from the district court's grant of summary judgment for defendants Anthony Brandt and William Morrow and Company, Inc. in this diversity case. In granting summary judgment, the district court rejected Rinsley's claim that publication of Brandt's book, *Reality Police: The Experience of Insanity in America* (1975), constituted an invasion of Rinsley's privacy because certain statements in the book placed him before the public in a false light. Analogizing the false light privacy action to a defamation suit, the court found that every statement of which Rinsley complained was either true or an opinion, and therefore not actionable.[1] Alternatively, the court found that even if some statements were false assertions of fact, Rinsley was a public figure and a public official and that Brandt and Morrow had not published these statements with actual malice. On appeal Rinsley contends that the district court erred (1) in finding that some statements were substantially true; (2) in finding that other statements were opinions or "rhetorical hyperbole"; (3) in separately analyzing each statement rather than considering the effect of those statements taken as a whole;

---

1. In the trial court Rinsley objected to eighteen statements. On appeal he objects to only four specific statements, although he asserts that the book's discussion of him read as a whole places him before the public in a false light.

(4) in finding that Rinsley was a public figure and public official; and (5) in finding that in publishing the statements, the defendants lacked actual malice.[2]

## I

In 1975 Morrow published *Reality Police,* in which Brandt bitterly criticizes the treatment of patients in mental institutions. As Brandt states, *Reality Police*

> "is about the exercise of [the power of psychiatrists to institutionalize people], about what happens to people we call crazy, or more often 'mentally ill.' About what the psychiatrists who work for us do to them and for them in the name of mental health.... What I have deep reservations about is the power we give [psychiatrists] to institutionalize and try to restructure people whose behavior distresses us for one reason or another—people we all too readily call crazy."

*Reality Police* at 13–14.

As one example of a psychiatrist's abuse of power in institutionalizing and treating mental health patients, Brandt discusses Doctor Rinsley, who was director of the Children's Section of Topeka State Hospital. Brandt generally criticizes Rinsley for being "accountable, in effect, to no one," *id.* at 218, and for his treatment of sick adolescents through intensive and often prolonged residential psychiatric treatment, *id.* at 220. Brandt illustrates his criticism through a "chilling example," *id.* at 217, involving Kelly Ann Brooks:

> "The case involves a little girl whom I shall call Melissa. According to her parents, this particular child was born with a mild case of cerebral palsy, one of the symptoms of which was something called 'tongue thrust.' Her tongue pushed the food out of her mouth when she tried to swallow. It is a fairly common symptom in CP and it sometimes makes for diffi-

cult feeding problems. Melissa's case was mild, however, mild enough, in fact, that over a period of years different doctors made different diagnoses; some decided she suffered from allergies, others from brain damage suffered at birth, and so on. Meanwhile Melissa, who was a bright child, learned to walk, albeit clumsily, and talk, though with a speech defect, and development seemed to be proceeding almost normally."

*Id.* at 222–23.

But at about age six, Kelly stopped eating and began to lose weight. Her parents took her to the Kansas University Medical Center, where she underwent treatment, initially with her parents' consent. Treatment continued without their consent after the state took legal custody of the child from her parents for medical neglect. Kelly stayed at the Medical Center for eighteen months, where doctors ultimately resorted to tube feeding and where, according to Mr. Brandt, "The doctors had the idea that by depriving the child of affection and other comforts they could *make* her swallow." *Id.* at 224. But, as Brandt alleges, the Medical Center gave up on Kelly and sent her to Rinsley's unit at the Topeka State Hospital "where the battle intensified." *Id.*

During the three years Kelly stayed at Topeka State, Rinsley and his staff continued to treat Kelly's inability to swallow food as a psychological rather than a physiological problem. Many of Brandt's severest criticisms of Rinsley focus on his treatment of Kelly. Brandt claims, for example, that Rinsley and his staff strictly limited her parents' visitation rights, secluded Kelly from the staff and other patients for long periods of time, used physical restraints, and employed "God knows what other cruelties he calls treatment." *Id.* at 227. According to Brandt, "God, parenthood, love were out; they had all been replaced by psychiatric theory. A the-

---

**2.** In an earlier ruling in December 1977, the trial court dismissed two other causes of action Rinsley had alleged in his complaint—libel and deprivation of civil rights. 446 F.Supp. 850 (D.Kan.1977). The ruling on those issues has not been appealed.

ory to which they were willing to sacrifice a child's life." *Id.* at 226.

As was the Medical Center, Rinsley and his staff were unsuccessful in their treatment; Kelly never regained the ability to swallow food. Tragically, when Kelly was eleven, she vomited her food during one of her tube feedings and choked to death. Stating that he is overwhelmed by "anger and rage at the unbelievable arrogance of this man's methods," Brandt asks, "What does it take to put a stop to such a man? How many more children must die?" *Id.* at 227.

## II

■ In *Froelich v. Adair,* 213 Kan. 357, 516 P.2d 993, 995–96 (1973), the Kansas Supreme Court recognized a cause of action for invasion of privacy and adopted the four types of invasion of privacy set forth in the Restatement (Second) of Torts.[3] Among them is the tort of "Publicity Placing Person in False Light," or the false light privacy action:

"One who gives publicity to a matter concerning another that places the other before the public in a false light is subject to liability to the other for invasion of his privacy, if

(a) the false light in which the other was placed would be highly offensive to a reasonable person, and

(b) the actor had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the other would be placed."

Restatement (Second) of Torts § 652E (1977).

■ The false light privacy action differs from a defamation action in that the injury in privacy actions is mental distress from having been exposed to public view,

while the injury in defamation actions is damage to reputation. *See Time, Inc. v. Hill,* 385 U.S. 374, 384 n. 9, 87 S.Ct. 534, 540 n. 9, 17 L.Ed.2d 456 (1967). In most aspects, however, the two actions are similar. For example, essential to both a false light privacy claim and a defamation claim is a determination that "the matter published concerning the plaintiff is not true." Restatement (Second) of Torts § 652E comment a, at 395. Thus, in a false light privacy action, as in a defamation action, truth is an absolute defense. Similarly, the defense available in a defamation action that the allegedly defamatory statements are opinions, not assertions of fact, is also available in a false light privacy action. This is because "[u]nder the First Amendment there is no such thing as a false idea. However pernicious an opinion may seem, we depend for its correction not on the conscience of judges and juries but on the competition of other ideas." *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 339–40, 94 S.Ct. 2997, 3006–07, 41 L.Ed.2d 789 (1974).

## III

Rinsley questions the correctness of the trial court's findings that two statements are true. Alternatively, he argues that it is improper for the court to make such factual findings on disputed issues in a summary judgment order.

■ In a false light privacy action whether a statement is true or false is a question of fact. *Cf.* Restatement (Second) of Torts § 617 (1977) (truth of statement is a question for the jury in defamation actions). Because a summary judgment order is proper only when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a

---

**3.** Although the court in *Froelich* referred to the tentative draft of the Restatement, we agree with the district court that the Kansas Supreme Court would accept the statement of the tort in the version finally adopted by The American Law Institute. *See* Restatement (Second) of Torts §§ 652B–652E (1977).

judgment as a matter of law," Fed.R.Civ.P. 56(c), the district court's findings regarding the truth of the two statements were proper only if Rinsley failed to raise a material issue of fact.

■ There is no material issue of fact concerning one of the statements Rinsley contends is false: "Has [Rinsley] done any follow-up studies to evaluate the long-term effectiveness of his methods? I have scanned his writings and found none." *Reality Police* at 227. In a deposition Rinsley in effect admitted the truth of Brandt's statement:

"Q: And there really has been no statistical study or followup study that focuses exclusively upon your work.

A: No, that was not the objective of the study.

Q: All right, sir, so when he asked the rhetorical question, Has he done any followup study to evaluate the long-term effectiveness of his methods, there really has been no followup study that is focussed [sic] upon the long-term effectiveness of your methods, or the correctness of your diagnosis, or your selection of modality of treatment that is directed toward the decisions that Dr. Rinsley made, has there?

A: Well, Mr. Patterson, in strictly speaking, no."

R. VIII, 243. Notwithstanding his deposition testimony, Rinsley argues that there is a study evaluating the effectiveness of his methods: an unpublished study on the effectiveness of treatment at Topeka State Hospital covering a twenty-year period, four of which are years during which Rinsley worked there. This study, however, does not focus exclusively on Rinsley's work, nor does it separately evaluate the effectiveness of his treatment. Moreover, in a footnote to the statement Rinsley contests, Brandt explains:

"Rinsley did do an unpublished follow-up study which indicates that at least 72 percent of those leaving his unit required further treatment, while a mere 6 percent were discharged as 'Recovered.' See Wilfred T. Miller, Sherrie Krentz, C. Lisa Lewis, and Donald B. Rinsley, *The Adolescent in Residential Treatment: A Twenty-Year Follow-Up Study,* mimeo, n.p., n.d."

*Reality Police* at 335 n. 62. We hold that the district court ruled properly on this statement since Rinsley failed to raise a genuine issue of fact.

■ The district court found that the other statement Rinsley contends is false, "Melissa's parents instituted a suit against Rinsley ... [,]" *id.* at 227, was technically false, because although Kelly's parents went to a lawyer to inquire about filing suit against Rinsley, they never commenced an action in state or federal court. Nevertheless, the court held that "the difference between the meaning conveyed and the actual truth is simply too slight to be actionable. To the author, and to many lay people, no doubt, the technical difference between 'instituting' a suit and going to see a lawyer about filing a suit is insignificant." R. II, 473. We agree with the trial court that any inaccuracy in the statement was too minor to be actionable. *See Hein v. Lacy,* 228 Kan. 249, 616 P.2d 277, 285 (1980); *Pierce v. Capital Cities Communications, Inc.,* 576 F.2d 495, 503–04 (3d Cir.), *cert. denied,* 439 U.S. 861, 99 S.Ct. 181, 58 L.Ed.2d 170 (1978); Restatement (Second) of Torts § 652E comment c (1977); *id.* § 581A comment f (1977) ("Slight inaccuracies of expression are immaterial provided that the ... charge is true in substance."). That Kelly's parents were so upset they pursued legal action is essentially true and undisputed. Brandt adequately dispelled any inaccurate inference about actual litigation by his statement in a footnote explaining: "They later abandoned the suit, not on its merits but because every lawyer they contacted advised them that the life of a crippled child has little monetary value." *Reality Police* at 335 n. 60.

## IV

Rinsley claims that the court erred in determining that two passages were "rhetorical hyperbole" or opinion, arguing instead that they were false assertions of fact.

Whether a given statement constitutes an assertion of fact or an opinion is a question of law to be determined by the court. *Old Dominion Branch No. 496, National Association of Letter Carriers v. Austin,* 418 U.S. 264, 283–84, 94 S.Ct. 2770, 2780–81, 41 L.Ed.2d 745 (1974). "The distinction frequently is a difficult one, and what constitutes a statement of fact in one context may be treated as a statement of opinion in another, in light of the nature and content of the communication taken as a whole." *Gregory v. McDonnell Douglas Corp.,* 17 Cal.3d 596, 601, 131 Cal.Rptr. 641, 644, 552 P.2d 425, 428 (1976). Even if a statement is an opinion and hence generally not actionable under the *Gertz* decision, the opinion nevertheless may give rise to a cause of action if it "implies the allegation of undisclosed defamatory facts as the basis of the opinion." Restatement (Second) of Torts § 566 (1977).

The first passage Rinsley points to contains two statements: "God, parenthood, love were out; they had all been replaced by psychiatric theory. A theory to which they were willing to sacrifice a child's life." *Reality Police* at 226. Considering the context of the first statement, we agree with the district court that it is an opinion and not actionable. In the first sentence Brandt simply restates and agrees with Kelly's parents' characterization of the psychiatrists as: "a bunch of people that really walk around like computers and zombies. It seems like they wouldn't show any emotion, emotion was out, parenthood was out, God .... There's no way for doctors and psychiatrists to take the place of parents." *Id.* at 226. Kelly's parents' statement and Rinsley's treatment methods, which Brandt discusses earlier in *Reality Police,* serve as the justification for Brandt's opinion.

Brandt's opinion, therefore, does not suggest any undisclosed facts that might be false.

The second phrase, "A theory to which they were willing to sacrifice a child's life," is a harsh statement concerning the extent to which Rinsley and his staff were committed to his theories. But as such, it is unverifiable and a statement of opinion. Even if, as Rinsley alleges, the statement suggests that Rinsley and his staff actually sacrificed Kelly's life to their psychiatric theory, on the next page Brandt explicitly states, "I have not said that Rinsley is responsible for Melissa's death, and I do not mean to imply it." *Id.* at 227. Considering this denial, we hold that Brandt's statement does not suggest undisclosed facts that would make his opinion actionable.

The second passage Rinsley points to states, "What does it take to put a stop to such a man? How many more children must die?" *Id.* Rinsley contends, "This statement restates the charge that Dr. Rinsley purposely killed Kelly Brooks and further charges that other children have been killed or will be killed by Dr. Rinsley." Appellant's Brief at 27. These rhetorical questions, like Brandt's earlier statement, "A theory to which they were willing to sacrifice a child's life," are severe criticisms of Rinsley and his methods. But they are exactly that—exaggerated expressions of criticism. They are the type of statement that our society, interested in free and heated debate about matters of social concern, has chosen to protect. *See Gertz,* 418 U.S. at 339–40, 94 S.Ct. at 3006–07.

As to Rinsley's claim that the passage implies he "purposely killed Kelly Brooks" and other children, we find nothing in that passage or anywhere else in *Reality Police* to support that contention. At most these rhetorical questions might imply that Rinsley was responsible for Kelly's death. But that implication is undermined by Brandt's explicit denial on the same page that he attributes any responsibility to Rinsley for Kelly's death.

## V

Rinsley also complains that the district court took a "piecemeal" approach in its review of the disputed passages, rather than considering the relevant passages in their entirety. He apparently quarrels with the district court's examination of each of the eighteen statements in *Reality Police* that he identified as objectionable at the district court level. Rinsley contends that if the court had read for a general impression rather than focusing on the truth or falsity of each statement or on its status as opinion or factual assertion, it would have concluded that *Reality Police* "as a whole unmistakedly provides the average reader with a 'picture' of Dr. Rinsley ... as an irresponsible throwback to the middle ages," Appellant's Brief at 16, and "as being no more enlightened than the inhuman, sadistic staff of Victorian London's Saint Mary's of Bethleham mental hospital." *Id.* at 18.

In a false light privacy action, as in a defamation action, a court should not consider words or elements in isolation, but should view them in the context of the whole article to determine if they constitute an invasion of privacy. *Cf. Chauffeurs, Teamsters and Helpers Local Union No. 795 v. Kansans for the Right to Work,* 189 Kan. 115, 368 P.2d 308, 315 (1962) (defamation); *Little v. Allen,* 149 Kan. 414, 8 P.2d 510, 511 (1939) (defamation); *Pierce v. Capital Cities Communications, Inc.,* 576 F.2d 495, 502 (3d Cir.) (defamation), *cert. denied,* 439 U.S. 861, 99 S.Ct. 181, 58 L.Ed.2d 170 (1978). However, this proscription against reading statements in isolation does not forbid the court from examining the particular statements identified as objectionable for their truth or falsity or for their status as opinions or factual assertions, as long as the court reads them in context. In the instant case the district court properly examined every statement Rinsley identified as objectionable. Rinsley does not allege, and our review of the court's decision does not disclose, that the district court considered any particular statement out of context.

The proscription against reading statements out of context does not relieve a plaintiff from identifying particular statements or passages that are false and invade his privacy. Unless he can successfully identify particular false statements that, taken in context, create the impression he is a "throwback to the middle ages," Rinsley cannot complain. We have examined *Reality Police* and find no statements, true or false, that imply Rinsley is a "throwback to the middle ages" or "no more enlightened than the inhuman, sadistic staff of Victorian London's Saint Mary's of Bethleham mental hospital."

## VI

Because we agree with the district court that the statements Rinsley objects to on appeal are not actionable, we do not decide whether Rinsley is a public figure or public official or whether the district court erred in finding that the defendants had acted without malice.

AFFIRMED.