**J. Dan METCALF, M.D., Plaintiff,**

v.

**KFOR–TV, INC. d/b/a Channel 4, a Michigan Corporation, Defendant.**

No. Civ–91–849–R.

United States District Court, W.D. Oklahoma.

Nov. 25, 1992.

Gary L. Richardson, Kevon V. Howald, Richardson & Stoops, Tulsa, OK, S. Richard Farber, Farber Kasper & Associates, Oklahoma City, OK, for plaintiff.

Robert D. Nelon, Laura B. Hood, Andrews Davis Legg Bixler Milsten & Price, Oklahoma City, OK, for defendant.

## ORDER

DAVID L. RUSSELL, District Judge.

Before the Court is Defendant's motion for summary judgment on Plaintiff's defamation claims. Defendant asserts that identified statement nos. 1, 2, 6, 9, 12, 15 and 17[1] are not "of and concerning" the Plaintiff, i.e., that they do not refer to him as a matter of law; that identified statements nos. 1, 2, 5, 6, 7, 10, 12, 13, 15 and 17 are not defamatory as a matter of law; that identified statements nos. 3, 8, 10, 16, 18, 19, 20, 22 and 23[2] are privileged as a matter of law pursuant to Okla.Stat. tit. 12, § 1443.1A (Third); that identified statements nos. 1, 2, 6, 7, 9, 10, 12, 15, 16, 17 and 23 and parts of identified statements nos. 3 and 4 are, as a matter of law, non-actionable opinions; that identified statements nos. 1, 5, 6, 11 through 20, 22 and 23 and portions of identified statements nos. 3 and 4 which have some element of factual statement in them are true as a matter of law and/or that Plaintiff has not and cannot show that such statements are false; that employees of Defendant exercised ordinary care as a matter of law in reporting news as it related to Plaintiff, including the "Beauty and the Buck" series and, conversely, that there is no evidence of negligence or reckless disregard for the truth on the part of Defendant or its employees; and that Plaintiff has no evidence that any injury he suffered was caused by Defendant's alleged defamation or any competent evidence of any injury.

1. Plaintiff has identified seventeen (17) statements in a three-part series entitled "Beauty and the Buck" televised on November 14, 15 and 16, 1990 by KFOR–TV which Plaintiff contends are defamatory and false. *See* Plaintiff's Supplemental Answer to Defendant's Interrogatory No. 6 (Exhibit "K" to Defendant's Brief). The full text of these seventeen statements is included in the Addendum to this Order.

2. Plaintiff has identified six (6) statements, hereinafter referred to as "identified statements" or simply "statements" nos. 18 through 23, from fifteen newscasts concerning the trial of *Cornelius v. Metcalf* broadcast by KFOR–TV over a period of five days which he contends are false and defamatory. *See* Plaintiff's Supplemental Answer to Defendant's Interrogatory no. 6 (Exhibit "K" to Defendant's Brief). The full text of these statements is included in the Addendum to this Order.

Plaintiff in response asserts that Defendant's motion only addresses Plaintiff's claim for libel *per se* and does not address his claim for libel *per quod* but that in any event, statements made by Defendant are libel *per se;* that the statements made by Defendant herein, taken as a whole, are reasonably susceptible to a defamatory meaning of questioning Plaintiff's competence as a plastic surgeon and physician, and implying that Plaintiff would lose a malpractice case; that the communications of Defendant, taken as a whole and not out of context, could be found to refer to the Plaintiff; that the statements complained of, taken within the context of the entire publications, do not amount to fair and true accounts of the proceedings and thus are not privileged; that the statements which Defendant asserts are opinion are, when analyzed according to the four factors set forth in *Ollman v. Evans,* 750 F.2d 970 (D.C.Cir.1984), *cert. denied,* 471 U.S. 1127, 105 S.Ct. 2662, 86 L.Ed.2d 278 (1985), statements of fact or opinions which imply the assertion of objective fact; and that the statements made, taken in context, are false and that the publications taken as a whole, imply a falsehood or are reasonably susceptible of an implication of falsity sufficient for *libel per quod.* Plaintiff also asserts that the affidavit of Dr. Jay Black and other evidence shows that Defendant failed to exercise ordinary care and acted with willful disregard for the truth of the broadcasts or reports or the implications therefrom. Plaintiff asserts that there is evidence that Plaintiff lost patients and income as a direct result of the publications. Plaintiff asserts that he is not legally required to quantify these losses.

Defendant argues in reply that Plaintiff's theory or theories of defamation by implication are not recognized in Oklahoma and that such theories are unavailing herein.

Other arguments were advanced by the parties in oral argument on this motion heard by the Court on November 17, 1992.

The Court addresses each of these arguments directed to the elements of defamation[3] and/or a defense thereto and the evidence applicable thereto.

### *"Of and Concerning"*

 The "of and concerning" element in defamation actions requires that the alleged defamatory comment refer to the Plaintiff. *McCullough v. Cities Service Co.,* 676 P.2d 833, 836–37 (Okla.1984) (citing *Brady v. Ottaway Newspapers, Inc.,* 84 A.D.2d 226, 445 N.Y.S.2d 786 (1981)); *Gentry v. Wagoner County Publishing Co.,* 351 P.2d 718, Syllabus by the Court at 3 (Okla.1960). The Court agrees with Plaintiff that the publication, "Beauty and the Buck," a three-part television news series, taken as a whole, on its face refers to Plaintiff and not to some other person. *See Gentry v. Wagoner County Publishing Co.,* Syllabus by the Court at 3; *Tulsa Tribune v. Kight,* 174 Okla. 359, 50 P.2d 350, 353 (1935) (libel). The publication explicitly and repeatedly refers to the Plaintiff and thus statements nos. 1, 2, 6, 9, 15 and 17, taken as a whole, when considered in the context of the entire publication, "Beauty and the Buck," refer to Plaintiff and not to another person.[4] *See Miskovsky v. Tulsa Tribune Co.,* 678 P.2d 242, 247 (Okla.1983), *cert. denied,* 465 U.S. 1006, 104 S.Ct. 1000, 79 L.Ed.2d 232 (1984) (citing *Winters v. Morgan,* 576 P.2d 1152 (Okla.1978)); *Layman v. Readers Digest Association,* 412 P.2d 192, 194–95 (Okla.1965). Statement no. 12, however, cannot reasonably be understood to refer to Plaintiff inasmuch as the publication

---

**3.** The Court treats this defamation action as one for slander rather than libel inasmuch as Oklahoma law defines libel as "a false or malicious unprivileged publication by writing, printing, picture, or effigy or other *fixed* representation . . .," Okla.Stat. tit. 12, § 1441 (emphasis added), and defines slander as "a false and unprivileged publication, other than libel. . . ." Okla.Stat. tit. 12, § 1442. The televised pictures are not "fixed" images and, in any event, the alleged defamatory aspects of the broadcasts herein are the spoken words, not the images accompanying

them. As a practical matter, at least in this case, it makes no difference whether the Court treats the alleged defamation as libel or slander since under Oklahoma law, the same result obtains. This is evident from the Court's citation to parallel Oklahoma authority on both libel and slander.

**4.** The same is true when each of these statements is considered only in context of the entire particular segment of the three-part broadcast in which the statement was made.

makes it clear that Plaintiff is not board certified.

### Defamatory

A publication is slanderous which, *inter alia,* tends to injure a person in respect to his profession, trade or business either by imputing to him general disqualification in those respects which his profession or occupation requires, or by imputing something with reference to his profession, trade or business that has a natural tendency to lessen its profit. Okla.Stat. tit. 12, § 1442.[5]

■ The Court does not interpret Defendant's motion directed to the issue of whether certain statements in Defendant's broadcasts are defamatory as directed only to the issue of whether the statements are libel or slander *per se,* as Plaintiff so interprets Defendant's Brief, inasmuch as Defendant clearly asserts that certain statements are "incapable of harming reputation." Defendant's Brief at p. 48. In any event, however, the Court concludes that none of the identified statements to which Defendant's motion is directed are slander *per se,* i.e., susceptible of but one meaning, and that an opprobrious one, *see Krebsbach v. Henley,* 725 P.2d 852, 856 (Okla.1986) (slander), *Gentry v. Wagoner County Publishing Co.,* 351 P.2d 718 (Okla.1960) (libel), with the exception of the last paragraph of Statement No. 3, which ascribes the "use of guinea pig methods" of treatment to a physician.

■ To determine whether a communication or broadcast is either defamatory *per se* or *per quod,* the Court must examine the entire communication since the language taken out of context may have a meaning different from its meaning within the entire communication, *see Miskovsky v. Tulsa Tribune Co.,* 678 P.2d at 247; *Winters v. Morgan,* 576 P.2d 1152, 1154 (Okla.1978); *Kleier Advertising, Inc. v. Premier Pontiac, Inc.,* 921 F.2d 1036, 1044 (10th Cir.1990) (libel), while giving the language employed its ordinary, natural and obvious meaning. *See Sellers v. Oklahoma Publishing Co.,* 687 P.2d 116, 120 (Okla.1984); *Nichols v. Bristow Publishing Co.,* 330 P.2d 1044, 1045 (Okla.1957); *Kee v. Armstrong, Byrd & Co.,* 75 Okla. 84, 182 P. 494 (1919). *See also Krebsbach v. Henley,* 725 P.2d at 856. If an identified statement, when considered in this manner, is reasonably susceptible of both a defamatory meaning and an innocent meaning, the statement is actionable as slander or libel *per quod. See, e.g., Sellers v. Oklahoma Publishing Co.,* 687 P.2d at 119–20 (citing *Fite v. Oklahoma Publishing Co.,* 146 Okla. 150, 293 P. 1073 (1930) and other cases) (libel). Only if the statements herein are not reasonably susceptible to a defamatory meaning is Defendant entitled to summary judgment on this issue. *See id.*

■ The Court concludes that the broadcast or communication "Beauty and the Buck" as a whole is slanderous *per quod* because it is reasonably susceptible of an implication that Plaintiff is not qualified to perform breast augmentation surgery and that he employs procedures that are not medically proper and personnel who lack the training to do what he employs them to do and thus tends to injure the Plaintiff in his profession and business by imputing his disqualification to do that which his profession or occupation requires or by imputing unprofessional conduct to him with reference to his profession which has a natural tendency to lessen its profit. *See* Okla.Stat. tit. 12, § 1442. Moreover, the Court concludes that all of the identified statements, when they are considered in the context of the entire broadcast, are capable of such a defamatory meaning,[6] with the exception of identified statement no. 12. Statement no. 12 is not reasonably susceptible of a defamatory meaning when considered in the context of the entire broadcast because the broadcast makes clear that the Plaintiff is not "board certified," that is, certified in a specialty by a

---

**5.** A publication is libelous if, *inter alia,* it "exposes any person to public hatred, contempt, ridicule or obloquy, or which tends to deprive him of public confidence, or to injure him in his occupation...." Okla.Stat. tit. 12, § 1441.

**6.** The Court reaches the same conclusion when each of identified statements nos. 1, 2, 5, 6, 7, 10, 13, 15 and 17 is considered only in the entire context of the particular segment of the three-part broadcast in which that statement was made.

board recognized by the American Board of Medical Specialties.

### Privilege

 Under Oklahoma law, a publication or communication is privileged and not actionable if it is made

First. In any legislative or judicial proceeding or any other proceeding authorized by law;

Second. In the proper discharge of an official duty;

Third. By a fair and true report of any legislative or judicial or other proceeding authorized by law, or anything said in the course thereof, and any and all expressions of opinion in regard thereto, and criticisms thereon, and any and all criticisms upon the official acts of any and all public officers, except where the matter stated of and concerning the official act done, or of the officer, falsely imputes crime to the officer so criticized.

Okla.Stat. tit. 12, § 1443.1. Where the content of the publication, who made it and what it is about are not in dispute, the question of whether a broadcast is privileged is generally a question of law for the Court. *See Crittendon v. Combined Communications Corp.*, 714 P.2d 1026, 1028 (Okla.1985); *Cobb v. Oklahoma Publishing Co.*, 42 Okla. 314, 140 P. 1079, 1081 (1914); *McCain v. KTVY, Inc.*, 738 P.2d 960, 962 (Okla.App.1987). Whether or not a broadcast is a "fair and true report" of a hearing is determined by application of the "substantial accuracy" of the *Restatement (Second) of Torts* § 611, Comment f (1977). *Crittendon v. Combined Communications Corp.*, 714 P.2d at 1029–30.

 With regard to Statement No. 3, the report of a $100,000 verdict in Tammy Knight's favor in a malpractice action against the Plaintiff, which attributed to Tammy Knight the testimony of her expert witness at trial, to the effect that she had a "unibreast," was a fair and true report of a judicial proceeding as a matter of law. Moreover, the depiction of the unibreast condition, which was the subject of the judicial proceeding, accurately depicted that condition and Tammy Knight's condition following surgery by Plaintiff, even though the uni-

breast depicted on "Beauty and the Buck" was not Ms. Knight's. *See* Deposition of Tammy Knight (Exhibit "G" to Defendant's Brief at pp. 42–3). The broadcast was fair because it also revealed that Ms. Knight's $100,000 judgment against Dr. Metcalf was being appealed. However, as to the remainder of identified statement no. 3, the Court cannot say one way or another, based upon the evidence before it, that Ms. Knight's statement about purported "guinea pig methods" employed by Dr. Metcalf to repair the unibreast condition was said in the course of her malpractice proceeding or was an expression of opinion or criticism in regard to the malpractice action. *See* Okla.Stat. tit. 12, § 1443.1. Nothing in the record indicates whether Dr. Metcalf's subsequent attempts to repair Ms. Knight's unibreast were the subject of her malpractice action.

 Statement No. 8 is also privileged as a matter of law. A proceeding to suspend a physician's license to practice is one authorized by law, *see* Okla.Stat. tit. 59, § 503 *et seq.*, and the placement of a physician on probation by the State Board of Medical Licensure and Supervision is authorized by law. *See* Okla.Stat. tit. 59, § 506. When Statement No. 8 is considered in conjunction with the immediately preceding statement in the broadcast, concerning suspension of Metcalf's license in 1978, the communication is a fair and accurate statement of a quasi-judicial proceeding, *see* Okla.Stat. tit. 59, § 513, authorized by law. See Deposition of Plaintiff J. Dan Metcalf (Exhibit "A" to Defendant's Brief), Vol. I at pp. 89–91 and Exhibits "M", "N" & "P" to Defendant's Brief. The report is not rendered unfair or not a substantially accurate account of the proceedings because it did not disclose that the suspension was for a period of sixty days or that Metcalf sought a stay of the suspension order, which was not granted until the 60–day period had elapsed. *See* Comment f, *Restatement (Second) of Torts* § 611. While Dr. Metcalf testified that he thought his probation only lasted one year, see Metcalf Deposition at p. 89, records of the State Board of Medical Examiners, *see* Exhibits "M" & "N" to Defendant's Brief, reflect a five-year probationary period.

■ Statement No. 10 raises the question of whether a hearing on an application to obtain recognition by the State Board of Medical Licensure and Supervision as "board certified" in cosmetic breast surgery is a "proceeding authorized by law" under Okla. Stat. tit. 12, § 1443.1. State statutes do not provide for such a proceeding. However, Rule 435:10–7–2 of the State Board of Medical Licensure and Supervision, promulgated pursuant to Okla.Stat. tit. 59, § 489, requires that physicians present "evidence of successful completion of all requirements for certification by a member Board of the organization of the American Board of Medical Specialties or by any other organization found by the Board [of Medical Licensure and Supervision] to be equivalent thereto" in order to lawfully claim that they are "Board Certified," "Certified by," a "Diplomat" or a "Fellow." Accordingly, the Court concludes that the hearing before the State Board of Medical Licensure and Supervision on Dr. Metcalf's application to be recognized as "Board Certified," see Metcalf Deposition, Vol. I at p. 100, was a proceeding authorized by law. Plaintiff admits that he submitted to the State Board a tape of an actual breast augmentation surgery performed by him on one of his patients and that it was a segment of that tape that was shown during "Beauty and the Buck." Metcalf Deposition, Vol. I at p. 273. He argues, however, that the report of this proceeding before the State Board was not "fair and true" because the part of the tape that was shown on "Beauty and the Buck" depicted the patient "moaning" whereas other parts of the tape, which purportedly did not show the patient "moaning" were not shown. Moreover, he argues that it was misleading to show the tape because it left the viewer with the impression that the moaning and hollering in the film was the norm for all of Metcalf's patients and, in the words of Dr. Charles Wright, "one tape doesn't a person's reputation make." Deposition of Charles Wright (Exhibit "E" to Defendant's Brief) at pp. 21–22.

The videotape was not represented by Defendant to be typical or representative of Plaintiff's mammoplasty surgery. It was introduced as exactly what it was—a videotape of Metcalf performing breast augmentation surgery on one of his patients, which Metcalf submitted to the State Board of Medical Licensure and Supervision in an effort to persuade the Board that he should be permitted to hold himself out as "board certified." The Court cannot say that showing just a portion of that videotape on "Beauty and the Buck" was unfair as unrepresentative of the whole tape because Plaintiff has not submitted a copy of the videotape as evidence herein. It seems obvious that Defendant could not show the whole videotape of the entire surgery in the brief broadcasts. Moreover, Linda Cavanaugh attended the hearing before the State Board of Medical Licensure and observed that one of the concerns voiced by doctors on the Board was the "moaning" of the patient depicted on the videotape. Deposition of Linda Cavanaugh Clark (Exhibit "B" to Defendant's Brief) at pp. 148 & 156–57. Finally, while Defendant showed a segment of the videotape Metcalf submitted to the Board and brief segments of a videotape of the State Board's hearing at which it denied Metcalf's application to represent himself as board certified, Defendant's report was not one-sided. Defendant also described and showed evidence favorable to the board's recognition of Metcalf as board certified—a letter from Dr. William Roy Morgan, Past President of the American Society of Cosmetic Breast Surgery to the State Board. See Videotape of "Beauty and the Buck" (Exhibit "R" to Defendant's Brief) and Letter from Dr. Morgan to the Oklahoma State Board of Medical Licensure and Supervision (Exhibit "O" to Defendant's Brief). No genuine issue concerning the substantial accuracy and fairness of the report of the proceeding before the State Board of Medical Licensure and Supervision authorized by law exists.

■ Statement No. 16 refers to the number of malpractice suits, five, filed against Plaintiff and Metcalf's comment thereon, that he didn't let that fact worry him too much. Such a report of the mere initiation of lawsuits and of the substance of the complaints is not privileged; some judicial action must have been taken before this privilege applies. See Comment e, Restatement (Second) of Torts § 611 (1977).

Statement No. 18 is privileged to the extent it reported that jury selection had begun in a case in which a former patient accused Dr. Metcalf of performing breast augmentations which left her deformed. There is no genuine issue of the material facts that this statement was a fair and substantially accurate account of a judicial proceeding—a civil trial on claims made by Maria Cornelius.[7] *See* Metcalf Deposition, Vol. II at p. 47; Amended Petition of Maria Cornelius (Exhibit "Z" to Defendant's Brief). However, the Court cannot say that the report of a statement attributed to Maria Cornelius' attorney—that nine other lawsuits brought by former patients were pending against Metcalf—is privileged as a matter of law because there is no evidence that judicial action had been taken in those cases and the mere fact that petitions had been filed is not privileged, see Comment e, *Restatement (Second) of Torts* § 611, and the reported statement of Maria Cornelius' attorney is not an expression of opinion or criticism in regard to the Cornelius judicial proceeding. *See* Okla.Stat. tit. 12, § 1443.1.

Identified statement no. 19, to the extent it states that another Oklahoma City physician [Metcalf] was in court "charged" with medical malpractice and that Maria Cornelius was suing him for $250,000,[8] claiming that Metcalf increased the size of her breasts when all she wanted was a breast lift, is a report of a judicial proceeding and no genuine issue of material fact exists with respect to the fairness or substantial accuracy of the report. The fact that the report used the term "charged" does not create a genuine

issue concerning its fairness or accuracy because the report makes it clear that the case was a civil malpractice action for damages. *Compare* Metcalf Deposition Vol. II, p. 57 *with* Statement No. 19.

There is no genuine issue of material fact concerning the privileged character of identified statement no. 20 except for the statement therein that "Metcalf claims he is an expert in the field of breast augmentation, but some former patients say he is incompetent." Statement No. 20, to the extent it relates to Metcalf, is otherwise a report of a then-ongoing judicial proceeding, trial of a civil malpractice action, which fairly and accurately reported the claims made by Maria Cornelius in that action, *see* Amended Petition of Maria Cornelius (Exhibit "Z" to Defendant's Brief) and Metcalf Deposition, Vol. II at pp. 55 & 57, and testimony given by Plaintiff's expert in that case. *See* Defendant's Statement of Undisputed Facts at ¶ 149 and Plaintiff's Response thereto at ¶ 149.

The second paragraph of identified statement No. 22 is privileged as a matter of law. It reported an ongoing civil trial and Plaintiff does not dispute its fairness or truthfulness. *See* Metcalf Deposition, Vol. II at pp. 63–64. The report of the allegations which were the subject of the trial was substantially true.

Statement No. 23, except for the sentences about the News Team 4 series and former patients' statements, is privileged. The communication was a report of a judicial

---

7. Plaintiff apparently claims that the statement in the May 6, 1991 noon news report that Maria Cornelius was suing him for $950,000, see identified statement no. 18 is false because Defendant's 6:00 p.m. news report stated that Cornelius was suing him for $250,000. Plaintiff has offered no evidence of the amount of damages sought by Maria Cornelius at trial. Moreover, there is evidence in the record that the amount of damages sought by Maria Cornelius was adjusted downward by her attorney during the day of trial during which Defendant reported the differing damage amounts. See Prasad Deposition (Exhibit "I" to Plaintiff's Brief) at p. 71. Finally, any error in reporting the amount of damages sought by Maria Cornelius does not render Defendant's report or reports not substantially accurate. *See Weisburgh v. Mahady*, 147 Vt. 70,

511 A.2d 304 (1986) (news account of plaintiff's arrest for receiving stolen property valued at $50,000 was substantially accurate even though the value of the property was $500); *Dudley v. Farmers Branch Daily Times*, 550 S.W.2d 99 (Tex.Civ.App.1977) (newspaper article stating that plaintiff was charged with theft of $168,000 worth of material was substantially true even if the value of the property was much less); *McCracken v. Evening News Association*, 3 Mich. App. 32, 141 N.W.2d 694 (1966) (report that plaintiff was charged with a $100,000 fraud was substantially true even though he was actually charged with a $50,000 fraud).

8. *See* note 7, *supra*.

proceeding. Plaintiff admits that it accurately reported the testimony at trial of Maria Cornelius' husband, see Metcalf Deposition, Vol. II at pp. 64–5, and the report accurately summarized Maria Cornelius' claim which was the subject of the proceeding. *See id.* at p. 55. Plaintiff contends that part of identified statement no. 23 implied that the jury would find Metcalf liable, when in fact it did not. There is no genuine issue of fact concerning the truth of the entire last paragraph, *see* Prasad Deposition at pp. 29–30, except the statement about the significance of the jury's note. The latter statement is an expression of an opinion in regard to a judicial proceeding, that is, concerning the possible significance ("that *could* mean . . . .") (emphasis added) of the jurors' note in that proceeding, and hence is privileged. *See* Okla.Stat. tit. 12, § 1443.1

### Opinion

As a general rule, statements which are opinionative and not factual in nature, which cannot be verified as true or false, are not actionable as slander or libel under Oklahoma law. *See, e.g., Miskovsky v. Oklahoma Publishing Co.,* 654 P.2d 587, 593–94 (Okla.1982). However, if an opinion is stated as or "is in the form of a factual imperative," or if an opinion is expressed without disclosing the underlying factual basis for the opinion, the opinion is actionable under Oklahoma law if the opinion implies or creates a reasonable inference that the opinion is justified by the existence of undisclosed defamatory and false facts. *See McCullough v. Cities Service Co.,* 676 P.2d 833, 835 (Okla.1984); *Restatement (Second) of Torts* § 566 (1977) (cited in *McCullough.*) The First Amendment to the United States Constitution requires that a statement by a media defendant on a matter of public concern must be provable as false before there can be liability under state defamation law. *Milkovich v. Lorain Journal Co.,* 497 U.S. 1, 19–20, 110 S.Ct. 2695, 2706, 111 L.Ed.2d 1, 18 (1990); *Philadelphia Newspapers, Inc. v. Hepps,* 475 U.S. 767, 776, 106 S.Ct. 1558, 1563–64, 89 L.Ed.2d 783, 792 (1986). Moreover, the First Amendment provides protection for statements that " 'cannot reasonably [be] interpreted as stating actual facts' "

about an individual. *Milkovich v. Lorain Journal Co.,* 497 U.S. at 20, 110 S.Ct. at 2706, 111 L.Ed.2d at 19 (*quoting Hustler Magazine v. Falwell,* 485 U.S. 46, 57, 108 S.Ct. 876, 883, 99 L.Ed.2d 41, 53 (1988)).

Whether a statement is one of fact or of opinion is a question of law for the Court. *See Ollman v. Evans,* 750 F.2d 970, 978 (D.C.Cir.1984) (*en banc*), *cert. denied* 471 U.S. 1127, 105 S.Ct. 2662, 86 L.Ed.2d 278 (1985); *Rinsley v. Brandt,* 700 F.2d 1304, 1309 (10th Cir.1983). The question is, however, a difficult one. See *Ollman* at 978–92; *Rinsley* at 1309.

The Court now examines each of the identified statements which Defendant asserts is opinion in light of the foregoing standards.

Identified statement no. 1 is as follows: "Doctors who sell beauty can make big bucks and that can sometimes mean big problems for patients. Tonight we begin a multi-part series looking at the situation."

Obviously, the second sentence cannot have a defamatory meaning. The first clause of the first sentence, "[d]octors who sell beauty can make big bucks" is objectively verifiable as true or false to the extent that when a certain figure is reached, there is a consensus that that amount of income constitutes "big bucks." However, the syntax of the sentence indicates that the meaning intended is that the ability of doctors selling beauty to make big bucks can sometimes cause big problems for patients, i.e., because cosmetic surgery is lucrative, doctors who may not be qualified to perform cosmetic surgery may do so, which can result in big problems for patients. Clearly, the statement is one of opinion as to whether the profitability of plastic surgery is the cause of big problems for patients. It is not objectively provable as true or false and no reasonable viewer/listener would interpret the statement as stating actual facts. "Big problems" in and of itself is an evaluative term.

The first paragraph of identified statement no. 2 is also clearly opinion. When the question, "[b]ut are all the physicians performing the operation qualified?" is

**1530**

converted to the statement, by implication, that "[n]ot all the physicians performing the operation are qualified" or even to the statement "Dr. Metcalf, who is performing the operation is not qualified," the statement is one of opinion. "Qualified," like the terms "incompetent" and "sloppy and irresponsible," is variously interpretable and too indefinite in meaning to be capable of being true or false. Moreover, the basis for any such opinion implied from the rhetorical question is presented in the broadcast. The next sentence by Cavanaugh, "[s]ome say no—in fact, they say some patients are in real danger," is a statement of fact concerning others' opinions. Whether some persons believe that not all of the physicians performing augmentation breast surgery are qualified to do so is verifiable as true or false. However, the "second level" of that statement—that not all physicians performing augmentation breast surgery are qualified to do so—is opinion. *See Milkovich v. Lorain Journal Co.*, 497 U.S. at 20 n. 7, 110 S.Ct. at 2706 n. 7, 111 L.Ed.2d at 18 n. 7 (a statement may be provable as false at two levels).

The next paragraph of identified statement no. 2 is Dr. Paul Silverstein's statement as follows:

"There's no doubt that patients are in danger. A lot of harm is being done to unsuspecting patients who think that they are going to a duly trained, certified, qualified doctor but they are not."

These statements are made as factual imperatives but on closer examination are judgmental statements in which the maker expresses his views. Whether or not patients "are in danger," whether a "lot of harm" is being done to unsuspecting patients and what a "duly trained" and "qualified doctor" is are matters of opinion. Dr. Silverstein's statement cannot reasonably be interpreted as stating actual facts.

Identified statement no. 6, except for the second and fifth sentences thereof, is opinion. That an Oklahoma medical license "is a powerful thing" is not verifiable; the statement is an evaluative, judgmental statement. That "[d]octors can legally do virtually anything they choose in their own office,"

when construed in context to refer to any surgical procedure or any cosmetic surgical procedure, is a factual statement as to which there is no genuine issue concerning its truth. *See* Metcalf Deposition at Vol. I, p. 321. The third and fourth sentences of identified statement no. 6 are clearly expressions of the opinions that most doctors don't abuse the privilege to legally do any surgical procedure they choose in their own office and that some doctors do abuse that privilege.

Statement no. 7 states in part "[b]ut the question is—is he qualified to do breast surgery?" Construing that statement in the context of the entire broadcast of which Plaintiff was the subject and assuming that the question by innuendo is a statement that Dr. Metcalf is not qualified to do breast surgery, the statement is an evaluative, judgmental statement not verifiable as true or false. The remainder of statement 7 is not opinion, but factual statement about which there is no genuine issue concerning its truth. *See* Metcalf Deposition Vol. 1, at pp. 171 & 322–29; Silverstein Deposition at pp. 48–49; Wright Deposition at p. 67.

Statement no. 9 is opinion in its entirety. No reasonable viewer or listener would understand the statements made by Dr. Wright that organizations such as the American Society of Cosmetic Breast Surgery are "shams perpetrated on the public by greedy doctors" as other than an expression of opinion. Whether or not something is a "sham" and a doctor or doctors are "greedy" are matters of opinion. *Compare with Phantom Touring, Inc. v. Affiliated Publications*, 953 F.2d 724 (1st Cir.1992), *cert. denied*, —— U.S. ——, 112 S.Ct. 2942, 119 L.Ed.2d 567 (1992) (publication describing Ken Hill's touring production of "Phantom of the Opera" as a "rip-off, a fraud, a scandal, a snake-oil job" was protected opinion).

The first two sentences of statement no. 10 are factual and there is no dispute as to their truth. *See supra* at p. 1527; Metcalf Deposition, Vol. I at p. 273. The statement "[b]ut what the doctors saw on this tape disturbed some of them and it may disturb you" is opinion. Whether or not something is disturbing or someone was or may be

disturbed is a matter of opinion or belief of the perceiver or observer. It is an evaluative characterization, not susceptible to proof of its truth or falsity.

■ All but the last sentence of identified statement no. 12 is factual in nature, and there is no genuine issue concerning the fact of the truthfulness of that portion of statement no. 12. *See infra* at pp. 1535–1536; Metcalf Deposition Vol. II, at p. 31. The last sentence of that statement, to the effect that board certification is one or "another" way that laypersons can gauge a doctor's ability and training is an opinion supported by disclosed facts which are neither false nor defamatory.

■ Statement no. 15 is not opinion. It is factual in nature in its entirety. It is verifiable as true or false.

■ Statement no. 16 is factual in nature. Assuming that Linda Cavanaugh's question concerning whether Dr. Metcalf was concerned that there were five lawsuits pending against him could by innuendo imply that because of the number of malpractice suits against Dr. Metcalf, he is not qualified to do breast augmentation surgery or incompetent, i.e., construing the question in a light most favorable to Plaintiff for purposes of this motion, the implied statement is one of opinion. Whether the number of malpractice suits filed against a physician is indicative of a physician's abilities is not capable of verification; hence, any innuendo that the number of malpractice suits brought against a physician indicates that that physician is not qualified to do what he does is a judgmental statement of the broadcaster's view. No reasonable viewer/listener could understand any innuendo raised by the question as an assertion of fact.

■ Identified statement no. 17 is largely factual in nature. The following portions of it may constitute opinion:

The question is are surgical suites in doctors' offices monitored closely enough. Critics say no.

. . . . .

Also, know that your physician can legally operate on you whether he or she is qualified or not. It's up to you to find out.

To the extent that the first statements are capable by innuendo of suggesting that doctors' offices and Dr. Metcalf's office in particular is not monitored closely enough, the statements are clearly judgmental and not susceptible to proof of their truth or falsity. Whether there exist critics who say that doctors' suites are not monitored closely enough, however, is a statement of fact, capable of verification. That doctors' offices are not monitored closely enough is clearly a matter of opinion of such critics, however.

■ That portion of identified statement no. 23 suggesting the possible significance of a question from the jury concerning damages is an expression of opinion of the speaker. It was stated in the form of an opinion or speculation ("that could mean ...") and could not be understood by a reasonable viewer/listener as a statement of fact, i.e., that the fact that the jury had requested information on damages meant that the jury *would* return a verdict in Plaintiff's favor.

■ Defendant asserts that parts of identified statement nos. 3 and 4 are opinion as well and thus cannot be false as a matter of law. The Court agrees that Tammy Knight's statement, "I feel that he used all these guinea pig methods and that is exactly what I call them—guinea pig methods because they just don't seem like the medical thing to do" is expressed in the form of an opinion, inasmuch as Knight couched her statement in terms of how she felt and how things seemed to her. However, the mere fact that a statement is couched in such terms is not conclusive on the issue of whether a statement implies an assertion of fact which is susceptible of being proved true or false. *See Milkovich v. Lorain Journal Co.,* 497 U.S. at 19–21, 110 S.Ct. at 2706–2707, 111 L.Ed.2d at 18–19. The Court believes that there is a consensus as to the meaning of the term "guinea pig" when used to describe methods. The term as so used is commonly understood to mean "experimental" or "unproved". The broadcast makes clear that Tammy Knight is a layperson. No reasonable viewer or listener would understand

Tammy Knight's statement as conveying facts. Even a physician's statement that methodology is medically experimental, unproved, and/or improper may constitute opinion. Certainly, a layperson's statement that she "feels that methods used were guinea pig methods because they don't seem like the medical thing to do" can only be understood as opinion. This is particularly true where, as here, the statement of Ms. Knight was followed by Dr. Metcalf's own statement that he "did proven techniques on her." Videotape of "Beauty and the Buck" (Exhibit "R" to Defendant's Brief). Although the details of the methods Dr. Metcalf used in an attempt to repair Ms. Knight's "unibreast" condition were not disclosed, the broadcast made it clear that Ms. Knight's opinion was based on her personal experience and Dr. Metcalf's four attempts to repair her condition. No argument is made that the factual basis for Knight's opinion, that is, the methods Dr. Metcalf actually employed, is false. With regard to identified statement no. 4, Miki Payne's statement, "[i]t was totally ruled that I had no blood clotting dysfunction," when considered in context is simply her restatement of Dr. Kanaa's opinion and reveals Ms. Payne's implicit opinion that Dr. Kanaa's opinion and report rather than Dr. Metcalf's opinion and lab reports were correct. The report of Dr. Kanaa, which stated "no gross hematological defects" was shown. The proximity of Miki Payne's bleeding to the breast surgery was disclosed. Thus, the basis for what was expressed as and is clearly Dr. Kanaa's opinion, "that the cause of the bleeding was probably local in nature, and probably due to the surgery," was disclosed. Both the statements of Miki Payne and of Dr. Kanaa are non-actionable opinion as a matter of law.

In his responsive brief and at oral argument, Plaintiff suggested that Defendant's broadcasts as a whole are false and defamatory by implication because as a whole they imply that Dr. Metcalf is greedy; that patients' moaning during surgery by Dr. Metcalf is the norm for Dr. Metcalf; that Dr.

Metcalf is not "legally or experientially qualified" to perform breast augmentation surgery; that Dr. Metcalf's office surgical suite is unsafe and that he should not be doing surgery there because it has not been inspected; that Metcalf is incompetent because of the number of malpractice suits filed against him; that Dr. Metcalf is "sleazy" because of his practice of sometimes having patients come in the back door; that Dr. Metcalf is not qualified to deal with complications; and that Dr. Metcalf is dangerous.

 Oklahoma courts have not, to date, expressly recognized the theory or theories of implied defamation urged by Plaintiff—that the publications as a whole were defamatory and untrue because of the omission of material facts or because the publisher used true facts to suggest or endorse a defamatory and false inference. *See, e.g., White v. Fraternal Order of Police,* 909 F.2d 512, 518–23 (D.C.Cir.1990); *Memphis Publishing Co. v. Nichols,* 569 S.W.2d 412 (Tenn. 1978). Even assuming, however, that the Oklahoma Supreme Court would recognize such theory or theories, they are of no assistance to the Plaintiff either because Plaintiff has failed to point to and submit evidence of true facts omitted from Defendant's broadcast, or because the alleged defamatory implications are not verifiable or susceptible of proof as true or false but are themselves opinion.[9] The claimed defamatory implications from Defendant's broadcast cannot reasonably be understood as implications of provable facts or as assertions of facts. *See White v. Fraternal Order of Police,* 909 F.2d at 522–23 (aggregate defamatory implication must be examined to determine whether the implication is itself a statement of opinion). *See also Milkovich v. Lorain Journal Co.,* 497 U.S. 1, 110 S.Ct. 2695, 111 L.Ed.2d 1.

*Falsity*

 The United States Supreme Court has held that the First Amendment to the United States Constitution requires that a private figure plaintiff bear the burden of

---

**9.** Defendant's broadcast "Beauty and the Buck" is not reasonably susceptible to the claimed defamatory implication that Plaintiff is not "legally qualified" to perform augmentation breast sur-

gery, i.e. that it is unlawful for a person having his qualifications to perform augmentation breast surgery.

proving the falsity of a statement on a matter of public concern in a defamation action against a media defendant. *Philadelphia Newspapers, Inc. v. Hepps,* 475 U.S. at 776, 106 S.Ct. at 1563, 89 L.Ed.2d at 792. Although the Supreme Court has not yet addressed the issue of whether, in a defamation action by a private figure against a media defendant involving the publication of matter of an exclusively private concern, the First Amendment likewise requires that the traditional common law rule that the defendant bear the burden of proving truth be supplanted by a constitutional rule placing the burden of proving falsity on the plaintiff. Whether a publication is a matter of public concern or purely private concern has proved to be a critical distinction in the Supreme Court's First Amendment jurisprudence. In a defamation action by a private figure plaintiff against a media defendant, where the published matter is of public concern, the plaintiff must show actual malice in order to recover presumed and punitive damages, *see Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 349–50, 94 S.Ct. 2997, 3012, 41 L.Ed.2d 789, 810–11 (1974), whereas a private figure plaintiff is not constitutionally required to prove that degree of culpability to recover presumed and punitive damages in a defamation action against a non-media defendant involving a publication of purely private concern. *See Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.,* 472 U.S. 749, 761 & 763, 105 S.Ct. 2939, 2946 & 2947, 86 L.Ed.2d 593, 603–04 & 605 (1985).[10]

To make matters more doubtful, it is not clear under Oklahoma defamation law, to the extent it remains unmodified by constitutional requirements, whether falsity is an element of the plaintiff's *prima facie* case or truth is an affirmative defense. *Compare* Okla.Stat. tit. 12, §§ 1441 (defining libel as "a false *or* malicious unprivileged publication") (emphasis added) *and* Okla.Stat. tit. 12, § 1442 (defining slander as "a false and unprivileged publication") *with* Okla.Stat. tit.

12, § 1444.1 (defendant "may prove that the matter charged as defamatory was true").

As a practical matter, however, whether the statements alleged to be defamatory herein involve matters of public concern or of a purely private concern makes no difference in the outcome of this motion inasmuch as Defendant has demonstrated the non-existence of a material issue of fact concerning the truth of all but one of the alleged statements, identified statement no. 1, which are the subject of its motion and Plaintiff has failed to submit evidence demonstrating the existence of a material issue of fact concerning the truth of all of such statements. Nevertheless, the Court does conclude, contrary to Plaintiff's assertion at oral argument, that the statements from "Beauty and the Buck," and the three-part broadcast itself, in content, form and context, as revealed by the whole record, indicate that the statements and series address matters of public concern—the qualifications of Dr. Metcalf and of doctors in general to do augmentation breast surgery and how the public or potential patients can ascertain such qualifications; the increased prevalence of the practice of performing surgery in surgical suites in doctors' offices rather than in hospitals; and the lack of regulation of that practice and inspection of such surgical suites. *See Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.,* 472 U.S. at 758–763, 105 S.Ct. at 2944–2947, 86 L.Ed.2d at 602–605 (*quoting Connick v. Myers,* 461 U.S. 138, 147–48, 103 S.Ct. 1684, 1690, 75 L.Ed.2d 708, 720 (1983)) (when speech addresses a matter of public concern). *Compare with Unelko Corp. v. Rooney,* 912 F.2d 1049, 1057 (9th Cir.1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 1586, 113 L.Ed.2d 650 (1991) (statement that a particular product did not work addressed a matter of public concern) *and with Blue Ridge Bank v. Veribanc, Inc.,* 866 F.2d 681, 686 (4th Cir.1989) (report listing bank as a federally insured bank which could reach "zero equity"

---

**10.** Five members of the Court in *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.* agreed that the rights of the institutional media under the First Amendment are no greater than those enjoyed by other individuals or organizations engaged in the same activities. Thus, it would appear that the character of the defendant is at least not as important as the character of the speech or publication in determining what effect the First Amendment has, if any, on a private figure plaintiff's burden of proof in a defamation action.

within one year related to a matter of public concern).

■ Reasonable jurors could not find that the first part of statement no. 1, that "[d]octors who sell beauty can make big bucks"—is false. Plaintiff stated on camera as follows:

So, I make a thousand dollars a case. I work thirty—forty minutes. Why sure, its good money. You [referring to the interviewer, Linda Cavanaugh] couldn't make a thousand dollars an hour and you're famous."

Videotape of "Beauty and the Buck" (Exhibit "R" to Defendant's Brief).

See also Transcript of November 15, 1990 10:00 p.m. news (Exhibit "S" to Defendant's Brief at p. 12). Plaintiff admitted in his deposition that doctors who do cosmetic surgery can make what, by most people's standards, is a lot of money. Metcalf Deposition at Vol. I, p. 297. But statement no. 1 reads in full:

Doctors who sell beauty can make big bucks and that can sometimes mean big problems for patients.

The statement does not say that doctors who sell beauty can cause big problems for patients. "[T]hat" as used in the sentence refers to doctors selling beauty who can make big bucks; thus the statement reasonably implies that it is cosmetic surgeons' ability to make a lot of money which is the cause of patient problems. The Court cannot say on the basis of the record that that statement is true as a matter of law.

■ There is no material issue of fact concerning the truth of statement no. 3, to the extent such statement is not opinion. Tammy Knight testified that her condition following Dr. Metcalf's breast augmentation surgery on her was a "unibreast" condition and that the picture of that condition which was aired accurately depicted such a condition. See Deposition of Tammy Knight (Exhibit "G" to Defendant's Brief), at pp. 42–3. A physician she saw subsequently and who testified as an expert in her malpractice case described her condition as a unibreast. Silverstein Deposition at p. 94. It is undisputed that Metcalf tried four times to repair the unibreast condition and could not. See Knight Deposition at p. 21.

■ There is no genuine issue concerning the truth or falsity of those parts of statement no. 4 which are not opinion. Miki Payne is a former patient of Dr. Metcalf's. See Payne Deposition; Medical Records of Michelle M. Payne (Exhibit "W" to Defendant's Brief); Metcalf Deposition, Vol. I at pp. 209–211. She hemorrhaged after surgery. See Payne Deposition at pp. 11–12, 17–18, 35–38; Metcalf Deposition, Vol. 1 at pp. 209–210. Dr. Metcalf told Miki Payne that she bled because of a "blood disorder". Payne Deposition at p. 38. Dr. Metcalf believed Miki Payne's bleeding problem was due to a low platelet count. See Metcalf Deposition at p. 210; Transcript of filed tape of interview with Metcalf by Cavanaugh (Exhibit "O" to Plaintiff's Brief) at unnumbered p. 12. Dr. Metcalf was unable to stop Ms. Payne's bleeding. Metcalf Deposition at p. 211; Payne Deposition at pp. 35–38. Payne in fact told Cavanaugh that Metcalf's inability to deal with complications caused her "real problems." Payne Deposition at p. 17. Payne's problems included having to be opened up and having blood drained from her breasts several times, scarring and pain as a result of that, hospitalization and eventually having to have her implants removed and then redone and the scars repaired. See Payne Deposition at pp. 10, 11–12, 17–18. Dr. Metcalf referred Miki Payne to a hematologist, Dr. Kanaa. See Metcalf Deposition, Vol. II at pp. 211 and 306.

The hematologist's report indicated "no gross hematological defects." See Medical Records of Michelle M. Payne (Exhibit "W" to Defendant's Brief), "History and Physical" by M.F. Kanaa, M.D. dated March 21, 1987, at p. 3. Miki Payne told Linda Cavanaugh that Dr. Kanaa told her that she did not have a blood disorder. Payne Deposition at p. 17. Dr. Kanaa did in fact reach the conclusion, based on his own blood workup, that Miki Payne did not have a blood clotting disorder and that the cause of her bleeding was probably "local in nature," that is, due to the surgery. Kanaa Deposition at p. 29; Medical Records of Michelle M. Payne "History and Physical" by M.F. Kanaa, M.D. at p. 3.

■ There is no material issue of fact concerning the truth of identified statement no. 5. Some of Dr. Metcalf's patients were shocked when they learned that Dr. Metcalf was not a plastic surgeon, which requires training significantly in excess of what Dr. Metcalf has, and that he is not certified as a plastic surgeon by a specialty board recognized by the American Board of Medical Specialties. *See* Deposition of Linda Cavanaugh Clark (Exhibit "B" to Defendant's Brief) at pp. 218–219, 223–224; Payne Deposition at p. 43; Knight Deposition at pp. 37, 38 and 42 (Deponent assumed that Metcalf was trained in surgery because he represented to her that he was a "board certified cosmetic surgeon." She later learned that he was not board certified and stated that if she'd known beforehand a lot of things that she learned after the fact, she would not have gone to Dr. Metcalf). *See* also Transcript of *Knight v. Metcalf* trial (Exhibit "V" to Defendant's Brief) at pp. 136 & 185 (Metcalf told Knight he was a board certified cosmetic surgeon and she believed that that meant he was a plastic surgeon, qualified to do breast augmentation surgery). Dr. Metcalf admits that he was not certified by any specialty board recognized by the American Board of Medical Specialties or a "member" of the American Board of Plastic Surgery, which requires years of formal training significantly in excess of that of Metcalf. Metcalf Deposition at pp. 21–26 and 99.

■ There is no genuine issue of material fact regarding the truth of identified statement no. 6, to the extent that it is not opinion. Dr. Metcalf admits that most surgery today is done in doctors' offices, as opposed to hospitals. Metcalf Deposition at p. 328. Metcalf also admits that he could legally perform in his office surgical suite any surgery he chooses to perform, but states that he wouldn't do so. Metcalf Deposition at p. 39. Metcalf also testified that out-patient surgery suites in doctors' offices are not regulated by anyone or inspected by the State Health Department. Metcalf Deposition, Vol. I at pp. 217–18. Moreover, Metcalf agreed that it is true that "doctors can legally do virtually anything they choose in their own office" and that "most doctors don't abuse that privilege, some do." Met-

calf Deposition, Vol. I at p. 321. It is true that if you have a complaint or want to check on the training or background of a particular physician, you can contact the Oklahoma Board of Medical Licensure as evidenced by the facts that Tammy Knight did write a letter of complaint to that board, *See* Knight Deposition at pp. 29–30, and medical applications for renewal certificates on file show post-graduate training and board certification(s). *See* Exhibit "P" to Defendant's Brief.

[55, 56] With respect to statement no. 11, Defendant has submitted evidence that one of Plaintiff's former patients was shocked to discover that the women assisting Dr. Metcalf in part of the surgical process are not nurses, just people Metcalf trained. *See* Knight Deposition at pp. 41–42. Defendant has also submitted evidence that a majority of the personnel that Metcalf uses and has used to assist him in surgery are not trained medical personnel but personnel whose only training has been that received from Dr. Metcalf himself. *See* Metcalf Deposition, Vol. I at pp. 114–130. Defendant has also proffered evidence that two doctors, Drs. Paul Silverstein and James Wright, were critical of the use of jeans in the operating room because of the risk that dirt and germs could be carried into the operating room, increasing the risk of infection. *See* Silverstein Deposition at pp. 121–125; Cavanaugh Deposition at p. 75. Dr. Metcalf admits that he has his patients wear jeans on the operating room during cosmetic surgery to enable him to "pick them up by their belt loops" after surgery. Metcalf Deposition, Vol. 1 at p. 1776. Except as to the issue of whether it is true that more than one of Metcalf's former patients had been shocked to learn that persons who assisted Dr. Metcalf in parts of the surgical process were not nurses, just people trained by Metcalf, Defendant has demonstrated the non-existence of a genuine issue concerning the truth of statement no. 11. However, any defamatory meaning which arises from the subject statement relates to the use of personnel who are not nurses, just people Metcalf trained, and not to whether or not one or more patients were "shocked" to learn this. Thus, whether or

not it is true that more than one of Metcalf's patients was "shocked" is immaterial. Moreover, since the subject of "Beauty and the Buck," the qualifications and training of those performing cosmetic breast surgery in office suites and assisting therein is a matter of public concern, Plaintiff has the burden of proving the falsity of statement no. 11. *See Philadelphia Newspapers, Inc. v. Hepps,* 475 U.S. 767, 776, 106 S.Ct. 1558, 1563, 89 L.Ed.2d 783, 792 (1986) (the First Amendment requires that a private figure plaintiff bear the burden of proving falsity of defamatory statements concerning a matter of public concern by a media defendant). Defendant asserts that Plaintiff has not met this burden. The Court agrees. Plaintiff has wholly failed to adduce any evidence of the falsity of statement no. 11.

■ There is no genuine issue of material fact concerning the truth of statement no. 12. Metcalf admitted that "being board certified is an indication to the public that the physician has a certain level of additional training or knowledge about a specialty." Metcalf Deposition, Vol. II at p. 31. A surgeon who becomes board certified in plastic surgery has completed at least six years of residency and has taken examinations by other board certified physicians and demonstrated expertise in that specialty by passing exams. Metcalf Deposition, Vol. II at pp. 31–32; Silverstein Deposition at pp. 17–18, 22–25 and 116; Wright Deposition at pp. 33–34.

■ There is no genuine issue of material fact concerning the truth or falsity of statement no. 13. Dr. Metcalf's surgical suite, which he admits was that depicted in the broadcast, *see* Metcalf Deposition, Vol. II at p. 33, is not inspected on any regular basis by medical authorities and it is not required to be inspected by the State Health Department unless more than one doctor operates in it. Metcalf Deposition, Vol. I at p. 217. Dr. Metcalf admits that there is no rule or regulation or requirement of the State Health Department or of the State Board of Medical Licensure that defines what kind of equipment he must have in his operating room, how it is set up or how surgery is conducted there. Metcalf Deposition, Vol. I at p. 218. Metcalf admits that he, alone,

decides what surgical procedures are employed in his operating room. *Id.* Metcalf does not have to report to any medical authority as to how many or what kind of surgeries he has done. *Id.* at pp. 218–219.

■ There is no dispute as to the truth of statement no. 14. Dr. Metcalf told Linda Cavanaugh during her interview of him that Renee McMillen was given antibiotics before and after her surgery and volunteered that "four weeks after surgery she was great." Videotape of "Beauty and the Buck" (Exhibit "R" to Defendant's Brief) and Transcript of filed tape of interview with Metcalf by Cavanaugh (Exhibit "O" to Plaintiff's Brief), at unnumbered p. 17. Dr. Metcalf performed breast augmentation surgery on Renee McMillen on November 26, 1988. Medical Records of Renee McMillen (Exhibit "Y" to Defendant's Brief). Four weeks after the surgery, on December 24, 1988, Renee McMillen was hospitalized at St. Mary's Hospital in Enid, Oklahoma, because of an infection of the right breast. Medical Records of Renee McMillen (Exhibit "Y" to Defendant's Brief); Metcalf Deposition, Vol. II at p. 35. Plaintiff has submitted no evidence which creates a genuine issue concerning the truth of these statements.

■ No genuine issue of fact concerning the truth of statement no. 15 exists. Both Drs. Silverstein and Wright have testified that more and more physicians have surgical suites in their offices where they now do surgery that used to be performed in hospitals. Silverstein Deposition at p. 54; Wright Deposition at p. 67. Plaintiff has submitted no evidence to the contrary. Dr. Metcalf testified that the only thing that he contends is false about Mr. Gamino's statement is the statement that "[there is] no one to follow those cases after they leave." Metcalf Deposition, Vol. II at p. 35. He contends that the statement is false to the extent it implies that Metcalf does not follow his patients after breast surgery because he follows them for a full year. Metcalf Deposition, Vol. II at pp. 35–37. The Court concludes as a matter of law that no reasonable viewer or listener could understand Mr. Gamino's statement to refer to a complete lack of follow-up visits or

care by physicians, including or with specific reference to Dr. Metcalf, after they or he perform surgery. It is apparent from the context of Mr. Gamino's statement that the reference is to the constant and immediate nursing or medical observation and care available in a hospital during the time that a patient remains there following surgery in that setting.

 No genuine issue of material fact concerning the truth of statement no. 16 is presented. Dr. Metcalf has admitted that at the time "Beauty and the Buck" was aired, there were five malpractice suits against him pending. Metcalf Deposition, Vol. I at p. 268 and Vol. II at p. 37. He admits that he said "I don't let it worry me too much" and that is preserved on videotape. Metcalf Deposition, Vol. II at p. 37; Videotape of "Beauty and the Buck" (Exhibit "R" to Defendant's Brief). Plaintiff contends, however, that omission of the remainder of his response—that "I can't afford to. I've got to worry about my patients too much," *see* Transcript of filed tape of interview with Metcalf by Cavanaugh (Exhibit "O" to Plaintiff's Brief) at unnumbered p. 21, and the failure to state that other doctors, including Dr. Silverstein, had malpractice suits against them, rendered the statement false. *See* Metcalf Deposition, Vol. I at pp. 242 and 268 and Vol. II at pp. 37–38. Non-disclosure of Dr. Metcalf's explanation of why he did not worry too much about malpractice suits and of the facts concerning whether malpractice suits were pending against other doctors, including Dr. Silverstein, does not render either Cavanaugh's or Metcalf's statements false. Moreover, any defamatory implications created by the omission, e.g., that Dr. Metcalf is callous or is not qualified to perform breast augmentation surgery because of the number of malpractice suits against him, are opinions, and such opinions do not imply the existence of undisclosed false and defamatory facts as a basis therefor. *See Restatement (Second) of Torts* § 566.

Plaintiff has admitted that all of the statements in identified statement no. 17 are true. Metcalf Deposition, Vol. II at p. 39. Any defamatory inference therefrom that Plaintiff is not qualified to do the surgeries he does,

see. *id.*, is opinion, *see* above. Accordingly, there is no genuine issue concerning the truth of identified statement no. 17.

 No genuine issue of fact exists concerning the truth of identified statement no. 18. Plaintiff admits that trial of Marie Cornelius' malpractice case against him began on May 6, 1991, *see* Defendant's Statement of Undisputed Material Facts at ¶ 137 and Plaintiff's Response thereto at ¶ 137, and admits that the statement "one of his patients accused him of performing breast augmentation which left her deformed" is a fair synopsis of Maria Cornelius' allegations in that suit. *See* Metcalf Deposition, Vol. II, p. 47; Defendant's Statement of Undisputed Material Facts at ¶ 144 and Plaintiff's Response thereto at ¶ 144. Metcalf testified that he believed that the statement attributed to Cornelius' attorney that nine other malpractice suits were pending against Metcalf "may be correct." Metcalf Deposition, Vol. II at p. 47. Defendant has submitted evidence of the existence of nine other malpractice suits then pending. Exhibit "T" to Defendant's Brief.

 No genuine issue as to the truth of identified statement no. 19 insofar as it pertains to the Plaintiff exists. In her Amended Petition, Maria Cornelius alleged that Dr. Metcalf was negligent in recommending augmentation mammoplasty; in failing to recommend mastopexy (breast lift); and in using implants that were too large for Plaintiff. Plaintiffs' Amended Petition, *Cornelius v. Metcalf*, Case No. CJ–89–11452 in the District Court of Oklahoma County, at ¶ 3 (Exhibit "T" to Defendant's Brief). Plaintiff does not assert that the statement that he claims he is an expert in the field of breast augmentation is false. See Plaintiff's Supplemental Answer to Defendant's Interrogatory No. 6 at Comment to Statement No. 19, p. 14. He contends that the characterization that he was "charged with medical malpractice" is false because he was not charged with a criminal offense. However, as indicated above, the Court concludes as a matter of law that no reasonable viewer/listener would understand that Metcalf was being charged with a criminal offense because the report stated that a former patient of Metcalf's was suing him for $250,000.

■ The first paragraph of identified statement no. 20 as it pertains to Dr. Metcalf is identical to statement no. 19 as it pertains to Dr. Metcalf. Here is no genuine issue as to the truth of that paragraph for the reasons given with respect to statement no. 19. An expert witness for Maria Cornelius testified that the augmentation surgery performed by Metcalf left Cornelius with "grotesque breasts" that were too large for her body frame. Prasad Deposition (Exhibit "I" to Defendant's Brief) at pp. 25–26. Maria Cornelius alleged in her Amended Petition that she had incurred additional medical expense for subsequent surgery as a result of Metcalf's alleged negligence in performing breast surgery using implants too large for her body. *See* Plaintiffs' Amended Petition, *Cornelius v. Metcalf,* Case No. CJ–89–11452 in the District Court of Oklahoma County (Exhibit "T" to Defendant's Brief) at ¶¶ 3 and 6. Plaintiff has submitted no evidence that any of the statements in the second paragraph of identified statement no. 20 are false. Thus, there is no genuine issue of material fact concerning the truth of these statements.

■ There is no genuine issue of material fact concerning the truth of any of the statements in the second paragraph of identified statement no. 22. Plaintiff has admitted that he does not believe that any of those statements are false and he admits that Maria Cornelius alleged that he performed the wrong surgery on her. *See* Metcalf Deposition, Vol. II at pp. 63–64. Maria Cornelius alleged that Metcalf was negligent in recommending and performing augmentation breast surgery and in failing to recommend mastopexy. Cornelius Amended Petition at ¶ 3.

The first paragraph of identified statement no. 22 merely states that it is a correction of an error made at the beginning of the program in which Defendant inadvertently showed a video of Dr. Joe Bills Reynolds while telling viewers of an upcoming story of Dr. Joe Dan Metcalf. There is no genuine issue of material fact concerning the truth of *this* statement. *See* Defendant's Statement of Undisputed Material Facts at ¶ 155 and Plaintiff's Response thereto at ¶ 155.

There is no genuine issue of material fact concerning the truth of identified statement no. 23, much of which, in substance, is repetitious of other identified statements already shown to be true. *See* above. Moreover, Plaintiff admits that Prasad's report in statement no. 23 is an accurate representation of Maria Cornelius' husband's testimony during trial. Metcalf Deposition, Vol. II at p. 64. Plaintiff has failed to submit any evidence of the falsity of any of the statements in identified statement no. 23, and in his Supplemental Answer to Defendant's Interrogatory No. 6, the only aspect of statement no. 23 which he contends is false is speculation concerning the jury's verdict. The Court has already concluded that the statement concerning the possible meaning of the jury's note is opinion. Plaintiff admits that the facts on which that opinion was based were disclosed. Metcalf Deposition, Vol. II at p. 65. Metcalf has submitted no evidence that the disclosed factual basis for the opinion was false.

### *Negligence*

■ The parties agree that Dr. Metcalf is a private figure rather than a public official or public figure. Thus, in order to recover on a libel or slander claim under Oklahoma law, consistent with the First Amendment, *see Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974), Plaintiff must show that Defendant failed to exercise ordinary care, i.e. was negligent. *Martin v. Griffin Television, Inc.,* 549 P.2d 85, 92 (Okla.1976); *Benson v. Griffin Television, Inc.,* 593 P.2d 511, 513 (Okla.App.1978). Ordinary care is "that degree of care which ordinarily prudent persons engaged in the same kind of business usually exercise under similar circumstances." *Martin v. Griffin Television, Inc.,* 549 P.2d at 92. This is the same standard of care imposed upon physicians and surgeons in Oklahoma, *id.,* which does not require infallibility. "The question in professional malpractice suits is not whether a [professional] has made a mistake, but whether he has used 'ordinary care'—that which is ordinarily exercised by his peers ... It does not mean that he cannot make mistakes." *Boy-*

*anton v. Reif,* 798 P.2d 603, 604–605 (Okla.1990).

Defendant alternatively asserts that there is no evidence in the record that KFOR–TV employees failed to use ordinary care in reporting news as it related to the Plaintiff and that its former employee Bill Prasad, who reported that Dr. Metcalf's license had been suspended pending the outcome of the Cornelius trial, *see* identified statement no. 21, when, as Defendant admits, it had not been suspended, exercised ordinary care as a matter of law.

■■■ A genuine issue of material fact exists as to whether Steve Clark, Maria Cornelius' attorney in her malpractice case against Dr. Metcalf, told Bill Prasad that Dr. Metcalf's license had been suspended pending the outcome of the civil case. Prasad has testified that Steve Clark told him Metcalf's license had been suspended pending the outcome of the civil trial, Prasad Deposition at pp. 36–37, whereas Steve Clark does not recall telling Bill Prasad that and says that he could not have told him that. Clark Deposition at pp. 25 and 27. The Court cannot make credibility determinations. Obviously, if a jury believed Clark and did not believe Prasad, it could find that Prasad and thus Defendant failed to exercise ordinary care or was reckless since, according to Prasad's testimony and the evidence of record, the only basis for the statements concerning suspension of Metcalf's license was Clark's alleged statement to Prasad. Thus, the existence of conflicting evidence as to whether Clark in fact told Prasad that Metcalf's license had been suspended is in and of itself sufficient to create a genuine issue of material fact concerning whether Defendant's employees exercised ordinary care.[11] In addition, there is evidence that Bill Prasad did not check the accuracy of Clark's alleged statement with anyone else, including the State Board of Medical Licensure and Supervision whom he knew had jurisdiction over license suspensions. See Prasad Deposition at pp. 36–38, 59 and 95. Prasad also admits that as a matter of standard practice, if the public records [of the State Board of Medical Licensure and Supervision] had been available to him on the evening he prepared his report, he would have checked the information he allegedly received from Clark. See Prasad Deposition at pp. 37–38. Finally, Prasad testified that he believed he knew, before he reported on the Cornelius trial, that a doctor's license is "not at issue" or "nor necessarily suspect" during a civil malpractice case. *Id.* at pp. 59 and 95.

Plaintiff has failed to submit any competent evidence from which reasonable jurors could find that Defendant failed to exercise ordinary care in reporting that "[s]ome say no [that not all physicians performing augmentation breast surgery are qualified]—in fact they say some patients are in real danger," part of identified statement no. 2, or in reporting that "some former patients say he [Dr. Metcalf] is incompetent," part of identified statement no. 20, and there is no evidence in the entire record from which rea-

---

11. Conflicting evidence on the issue of whether Steve Clark told Bill Prasad that Metcalf's license had been suspended also creates the existence of a genuine issue of the material fact of whether Defendant had knowledge of the falsity of the statement that Dr. Metcalf's license was suspended pending the outcome of the trial or recklessly disregarded the truth, that is, in fact entertained serious doubts as to the truth of the statement, precluding summary judgment for Defendant on the issue of punitive damages. *See Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 349, 94 S.Ct. 2997, 3011–12, 41 L.Ed.2d 789, 810 (1974) (the First Amendment precludes states from allowing private figure plaintiff from recovering punitive damages on a showing less than one of knowledge of falsity or reckless disregard for the truth, at least in matters of public concern). If the jury believed that Steve Clark did not tell Bill Prasad that the Plaintiff's license had been suspended and did not believe Prasad's testimony but, conversely, believed that his report was a deliberate lie, a jury could reasonably find that Prasad actually entertained serious doubts as to the truth of the report or had subjective awareness of its probable or actual falsity. *See St. Amant v. Thompson,* 390 U.S. 727, 88 S.Ct. 1323, 20 L.Ed.2d 262 (1968); *Jurkowski v. Crawley,* 637 P.2d 56, 61–62 (Okla.1981). Obviously, a genuine issue of material fact concerning Defendant's fault or culpability also exists if a lesser standard than that of actual malice is required for the recovery of punitive damages herein because the statement at issue is not a matter of public concern, *see Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.,* 472 U.S. 749, 761 & 763, 105 S.Ct. 2939, 2946 & 2947, 86 L.Ed.2d 593, 603–4 & 605 (1985) (plurality); *see also Philadelphia Newspapers, Inc. v. Hepps,* 475 U.S. at 774–75, 106 S.Ct. at 1563, 89 L.Ed.2d at 791–92.

sonable jurors could find in Plaintiff's favor on this issue.

### Causation and Damages

■■■■ There is evidence in the record that attorneys who employed Dr. Metcalf to perform medical examinations and/or to testify in workers' compensation cases "quit using ... [him] as much" as a result of Defendant's broadcast that Plaintiff's license had been suspended, even after having been told by Metcalf that his license had not been suspended, see Metcalf Deposition (Exhibit "A" to Plaintiff's Brief) at pp. 286–287, from which a loss of income can be inferred. Accordingly, Defendant's motion for summary judgment directed to the issues of causation and damages is denied.

### Conclusion

In accordance with the foregoing, the motion for summary judgment of Defendant KFOR–TV, Inc. on Plaintiff's defamation claims is **GRANTED** except to the extent Plaintiff's defamation claim is predicated on statement no. 21, in which respect Defendant's motion for summary judgment is **DENIED.**

IT IS SO ORDERED.

### ADDENDUM

Statements from "Beauty and the Buck," a three-part series aired by Defendant on November 14, 15 and 16, 1990, claimed by Plaintiff to be false and defamatory:

### Statement No. 1

Cavanaugh: "Doctors who sell beauty can make big bucks and that can sometimes mean big problems for patients. Tonight we begin a multi-part series looking at the situation."

### Statement No. 2

Cavanaugh: "But are all the physicians performing the operation qualified? Some say no—in fact, they say some patients are in real danger."

Silverstein: "There's no doubt that patients are in danger. A lot of harm is being done to unsuspecting patients who think they are going to a duly trained, certified, qualified doctor but they are not."

### Statement No. 3

Cavanaugh: "She says the doctor who operated on her gave her a unibreast. This is a unibreast. Look at the photograph and you can see the breasts aren't separated as they would be normally. There's no cleavage. Now watch as a pen is used to push the flesh back against the chest wall where it belongs.

Instead of two separate breasts, there appears to be only one. Tammy says the doctor who performed the breast augmentation tried four times to fix it but couldn't. She's bitter."

Knight: "You know, I feel that he used all these guinea pig methods and that's exactly what I call them—guinea pig methods because they just don't seem like the medical thing to do."

### Statement No. 4

Cavanaugh: "This is also a former patient. She says Metcalf's inability to deal with complications caused her real problems. She hemorrhaged after his surgery. He told her she bled because of a blood disorder. She says a blood specialist says that wasn't the case."

Mike Payne: "It was totally ruled that I had no blood clotting dysfunction."

Cavanaugh: "So you think that she had a blood problem and it wasn't a result of any inadequacy on your part?

Metcalf: "Oh, she did. I have the lab slips that show her platelets were low."

Cavanaugh: "We checked the lab slip and the hematologist's report. The bottom line, no gross hematological or blood defects.

According to the expert Mr. Metcalf himself consulted, there was probably only one reason why she bled."

Kanaa: "I felt that the cause of the bleeding was probably local in nature, and probably due to the surgery."

## Statement No. 5

Cavanaugh: "But some women who trusted Dr. Metcalf's hands to perform their surgery were shocked to find out he didn't have the training they presumed he had. He is not board certified. He is not a plastic surgeon."

## Statement No. 6

Cavanaugh: "The bottom line is this: An Oklahoma medical license is a powerful thing. Doctors can legally do virtually anything they choose in their own office. Most don't abuse that privilege. Some do. If you have a complaint and want to check on the training or background of a particular physician, you can contact the Oklahoma Board of Medical Licensure at . . ."

## Statement No. 7

Cavanaugh: ". . . but the question is—is he qualified to do breast surgery? Tonight as we continue our multi-part series, "Beauty and the Buck", we'll look at his background. Dr. Metcalf is one of a growing number of Oklahoma physicians who've set up surgery suites in their own office, regulated by no one."

## Statement No. 8

Cavanaugh: "He was put on probation for five years. He has his license back now and the fact is that license gives him the legal right to perform any type of surgery he chooses in his own office—trained or not, unsupervised."

## Statement No. 9

Wright: "They're shams and they're shams perpetrated on the public by greedy doctors. You have to question why a doctor would belong to such a society."

## Statement No. 10

Cavanaugh: ". . . to show them his expertise in the field of cosmetic breast surgery. It shows him doing surgery on one of his patients. But what the doctors saw on this tape disturbed some of them and it may disturb you."

## Statement No. 11

Cavanaugh: ". . . some of his practices raise the eyebrows of others in the medical community. Some patients say they were shocked to discover that the women assisting Dr. Metcalf in parts of the surgical process are not nurses, just people he trained. Some doctors criticize him because he requires his patients to wear jeans during the surgery. He says he uses the belt loops to lift the patient after the operation."

Cavanaugh: "But others say that's unacceptable. That jeans have no place in an operating room."

## Statement No. 12

Cavanaugh: "So, what does it mean to be board certified? It's an indication to the public that the physician has a certain level of additional training and knowledge about a particular specialty. It also means they've shown that expertise by passing exams. In other words, it's another way that you and I can gauge a doctor's ability and training."

## Statement No. 13

Cavanaugh: ". . . monitoring those offices to make sure they're clean and to make sure that standard medical procedures are followed. Tonight, we conclude our multi-part series, "Beauty and the Buck", with a look at who's keeping an eye on those surgical suites."

Cavanaugh: "This woman is going into surgery. It's taking place in Dr. Joe Metcalf's office, not a hospital."

Cavanaugh: "What may surprise you is that no health authority is required to check this surgical suite to make sure it's up to health standards to cleanliness or safety, or to make sure proper medical procedures are followed."

Silverstein: "There are absolutely no regulations. No regulations at all in the state of Oklahoma concerning operating facilities in a doctor's office. A doctor can do anything he wants in his office. There is no restriction."

## Statement No. 14

Cavanaugh: "So Renee was given antibiotics before the surgery?"

Metcalf: "You bet she was. And afterwards too. And four weeks after surgery she was great."

Cavanaugh: "Four weeks after surgery, Renee had been hospitalized with the infection at St. Mary's Hospital in Enid."

## Statement No. 15

Gamino: "What's happening today is with the technology involved, so many physicians are able to set up an office surgical center or an office surgical suite and do procedures that used to be done under hospital auspices in their own office with no one to review those and no one to follow those cases after they leave."

## Statement No. 16

Cavanaugh: ". . . the number of malpractice suits."

Cavanaugh: "Does it concern you that you have five lawsuits filed against you?"

Metcalf: "I don't let it worry me too much."

## Statement No. 17

Cavanaugh: "Now let me make something clear. Surgical complications, including infections, can happen in hospitals as well. The question is are surgical suites in doctor's offices monitored closely enough. Critics say no. Thousands of Oklahomans will have surgery in their doctor's offices in the coming months. And whether it's cosmetic surgery or anything else, health advisors say go in knowing that no one is checking that doctor's office for compliance with even basic health standards. Also, know that your physician can legally operate on you whether he or she is qualified or not. It's up to you to find out."

Statement from May 6, 1991 noon news broadcast by Defendant claimed by Plaintiff to be false and defamatory:

## Statement No. 18

KFOR Newscaster: "A plastic surgeon in court at this hour is charged with the death of his wife. An Oklahoma City plastic surgeon was in court briefly this morning. Dr. Joe Bill Reynolds is charged with second degree murder in the death of his wife. News Team 4's report, Bill Prasad, is standing by now at the courthouse. Bill, what's happening with the case?"

Bill Prasad: "Terre, there's been a major surprise here that thus far has been shrouded in mystery. The trial of Dr. Joe Bill Reynolds will not begin today. It will begin on Monday. The DA's office, the defense attorneys, the Judge—all of them thus far have no comment. Now, Dr. Reynolds was in court this morning. The 54–year–old man faces a second degree murder charge in the death of his wife, Sharon. She died after being taken to South Community Hospital back in September of 1989. She had just undergone liposuction surgery at the hands of her husband. Liposuction surgery is a procedure used to remove fat from the body. Prosecutors say Reynolds acted recklessly when he did that surgery. That's why they are charging him with second degree murder. Now, thus far, we do not know why that trial has been continued until next Monday. All of the people involved are saying nothing at this point. Hopefully, we will know more as the afternoon continues."

KFOR Newscaster: "Bill, there's been an awful lot of publicity here locally about that case. Any talk about how that might affect the outcome for Dr. Reynolds?"

Bill Prasad: "There could be in the fact that it could take a lot longer to pick jurors in this case. The average number of jurors being looked at for each individual case is about 40. They may look at a prospective juror selection crowd of about 150 people. So that may take some time when this continues again on Monday."

KFOR Newscaster: "Okay, so it's going to be a lengthy process. Bill Prasad, downtown, thanks very much."

KFOR Newscaster: "They are picking a jury this morning in the trial of another

Oklahoma City surgeon accused of malpractice. You may remember Dr. J. Dan Metcalf from our series Beauty and the Buck. One of his patients accused him of performing breast augmentations which left her deformed, and now she is suing for $950,000.00. The trial is expected to last a week. The woman's attorney says that nine other lawsuits are pending against Metcalf from former patients of his."

Statement from May 6, 1991 6:00 p.m. news broadcast by Defendant claimed by Plaintiff to be false and defamatory:

### Statement No. 19

Cavanaugh: "[A pair of Oklahoma City doctors making news in the courts today. The first involves Oklahoma City plastic surgeon, Dr. Joe Bill Reynolds. He is charged with second degree murder in the death of his wife. She died in 1989 just hours after he performed liposuction surgery on her in his office. Jury selection was to have begun this morning but in a surprise move, the Judge put the case over until Monday.] And another Oklahoma City physician in court today charged with medical malpractice. We first introduced you to Dr. Joe Dan Metcalf in our series Beauty and the Buck. Metcalf claims he is an expert in the field of breast augmentation, but some former patients say he is incompetent. One of them, Maria Cornelius, is suing him for $250,000.00. She's claiming that Metcalf increased the size of her breasts when all she wanted was a breast lift. Testimony in that case will continue tomorrow."

Statement from May 6 & 7, 1991 6:00 p.m. and 10:00 p.m. news broadcasts by Defendant claimed by Plaintiff to be false and defamatory:

### Statement No. 20

Cavanaugh: "[A pair of Oklahoma City doctors making news in the courts today. The first involves Oklahoma City plastic surgeon, Dr. Joe Bill Reynolds. He is charged with second degree murder in the death of his wife. She died in 1989 just hours after he performed liposuction sur-

gery on her in his office. Jury selection was to have begun this morning but in a surprise move, the Judge put the case over until Monday.] And another Oklahoma City physician in court today charged with medical malpractice. We first introduced you to Dr. Joe Dan Metcalf in our series Beauty and the Buck. Metcalf claims he is an expert in the field of breast augmentation, but some former patients say he is incompetent. One of them, Maria Cornelius, is suing him for $250,000.00. She's claiming that Metcalf increased the size of her breasts when all she wanted was a breast lift. Testimony in that case will continue tomorrow."

Bruce: "[There may be one more piece of evidence to examine in the murder of an Oklahoma City doctor's wife. This after, the body of Sharon Reynolds may have been exhumed from a city cemetery. Reynolds died in 1989 after her husband conducted fat removal surgery on her. Dr. Joe Bills Reynolds is charged with second degree murder. The Daily Oklahoman reported that defense attorneys want to exhume to body to prove that Mrs. Reynolds committed suicide by taking drugs before the surgery. Attorneys refuse to confirm the exhumation due to a Judge's gag order.] And in another court room, video tape testimony of a physician saying an Oklahoma City doctor left one patient with breasts too large for her body frame. Maria Cornelius is suing Dr. Joe Dan Metcalf for $250,000.00. The woman says she had to have another operation to correct the problem. Tomorrow on Capitol Hill, a showdown between two gun control bills."

Statement from May 9, 1991 6:00 a.m. and noon news broadcasts by Defendant claimed by Plaintiff to be false and defamatory:

### Statement No. 21

Bill Prasad: So this issue is on hold, just like Dr. Metcalf's practice. According to attorney, Steven Clark, Dr. Metcalf's license was suspended pending the outcome of this trial. The decision now lies with the State Medical Board.

Statement from May 6 & 8, 1991 6:00 p.m. news broadcast by Defendant claimed by Plaintiff to be false and defamatory:

*Statement No. 22*

Bruce: "A correction for you. At the beginning of the program, we told you we would have the story on Dr. Joe Dan Metcalf. We inadvertently showed a video of Dr. Joe Bills Reynolds, and we regret the error."

Cavanaugh: "A jury is debating the verdict in the case of this physician, Dr. Joe Dan Metcalf. A patient is suing him claiming he performed the wrong surgery on her. It's our top story. Good evening. I'm Linda Cavanaugh."

Statement from May 8, 1991 6:00 p.m. news broadcast by Defendant claimed by Plaintiff to be false and defamatory:

*Statement No. 23*

Bruce: "Oklahoma City physician, Joe Dan Metcalf, is waiting. A former patient has taken him to court claiming her performed the wrong surgery on her. Right now the jury is out. News Team 4's Bill Prasad is following the trial."

Prasad: "Maria Cornelius is 5′ 1″, about 100 pounds, but her husband says Dr. Joe Dan Metcalf gave her breasts the size of soccer balls. A News Team 4 series, Beauty and the Buck, focused on Dr. Metcalf's practice, or malpractice as some women called it. Several former patients said Metcalf mutilated their breasts. Cornelius sued Metcalf for $250,000.00 claiming he performed the wrong surgery on her. She wanted a breast lift, but she says Metcalf gave her abnormally large breasts."

Prasad: "The jury came back just a couple of minutes ago but apparently it is a false alarm. They are going to go to dinner, come back in about an hour, and continue their deliberations. Now, they've been deliberating since 1:30. That's about four and a half hours. A short time ago, a bailiff took a note from a juror. In that note was a request for more information on damages. That could mean that the jury has decided on its verdict and that the jury is going to place that verdict in favor of the Plaintiff, Maria Cornelius, and at this point they are assessing damages. We will have a little bit more on this tonight at 10:00."